**Exhibit A**



AGREEMENT BETWEEN

# THE CITY OF AUSTIN
### AND
## CENTRAL TEXAS ALLIED HEALTH INSTITUTE
### FOR

### SOCIAL SERVICES

*(COVID-19 Workforce Development Program)*

### AGREEMENT NO. 4700 NG200000072

### AGREEMENT AMOUNT: **$200,000**

This Agreement is made by and between the City of Austin (the City) acting by and through its Austin Public Health department (APH), a home-rule municipality incorporated by the State of Texas, and Central Texas Allied Health Institute (Grantee), a Texas non-profit corporation, having offices at 2101 E St Elmo Rd., Austin, Texas 78744.

## SECTION 1.   GRANT OF AUTHORITY, SERVICES AND DUTIES

1.1   **Engagement of the Grantee**. Subject to the general supervision and control of the City and subject to the provisions of the Terms and Conditions contained herein, the Grantee is engaged to provide the services set forth in the attached Agreement Exhibits.

   1.1.1   This Agreement entered into between the City and the Grantee is designated a Social Services REIMBURSABLE Agreement.

1.2   **Responsibilities of the Grantee.** The Grantee shall provide all technical and professional expertise, knowledge, management, and other resources required for accomplishing all aspects of the tasks and associated activities identified in the Agreement Exhibits. The Grantee shall assure that all Agreement provisions are met by any Subgrantee performing services for the Grantee.

1.3   **Responsibilities of the City.** The City's Contract Manager will be responsible for exercising general oversight of the Grantee's activities in completing the Program Work Statement. Specifically, the Contract Manager will represent the City's interests in resolving day-to-day issues that may arise during the term of this Agreement, shall participate regularly in conference calls or meetings for status reporting, shall promptly review any written reports submitted by the Grantee, and shall approve all requests for payment, as appropriate. The City's Contract Manager shall give the Grantee timely feedback on the acceptability of progress and task reports. The Contract Manager's oversight of the Grantee's activities shall be for the City's benefit and shall not imply or create any partnership or joint venture as between the City and the Grantee.

1.4   **Designation of Key Personnel.** The City's Contract Manager for this Agreement, to the extent stated in the preceding Section 1.3, shall be responsible for oversight and monitoring of Grantee's performance under this Agreement as needed to represent the City's interest in the Grantee's performance.

   1.4.1 The City's Contract Manager or designee:

   - may meet with Grantee to discuss any operational issues or the status of the services or work to be performed; and

   -shall promptly review all written reports submitted by Grantee, determine whether the reports comply with the terms of this Agreement, and give Grantee timely feedback on the adequacy of progress and task reports or necessary additional information.

1.4.2 Grantee's Contract Manager or designee, shall represent the Grantee with regard to performance of this Agreement and shall be the designated point of contact for the City's Contract Manager.

1.4.3 If either party replaces its Contract Manager, that party shall promptly send written notice of the change to the other party. The notice shall identify a qualified and competent replacement and provide contact information.

## SECTION 2.   TERM

2.1   **Term of Agreement.**  The Agreement shall be in effect for a term of 13 months beginning September 1, 2020 through September 30, 2021, and may be extended thereafter for up to one (1) additional 12 month period, subject to the approval of the Grantee and the City Purchasing Officer or their designee.

2.1.1 Upon expiration of the initial term or period of extension, the Grantee agrees to hold over under the terms and conditions of this Agreement for such a period of time as is reasonably necessary to re-solicit and/or complete the project (not to exceed 120 calendar days unless mutually agreed upon in writing).

## SECTION 3.   PROGRAM WORK STATEMENT

3.1   **Grantee's Obligations.**  The Grantee shall fully and timely provide all services described in the attached Agreement Exhibits in strict accordance with the terms, covenants, and conditions of the Agreement and all applicable federal, state, and local laws, rules, and regulations.

## SECTION 4.   COMPENSATION AND REPORTING

4.1   **Agreement Amount.**  The Grantee acknowledges and agrees that, notwithstanding any other provision of this Agreement, the maximum amount payable by the City under this Agreement for the initial term shall not exceed the amount approved by City Council, which is **$200,000 (*Two Hundred Thousand dollars*)**, and $200,000 (*Two Hundred Thousand dollars*) per 12 month extension option, for a total Agreement amount of $400,000. Continuation of the Agreement beyond the initial term is specifically contingent upon the availability and allocation of funding, and authorization by City Council. Additional compensation terms are included in Exhibit B.3.

4.2   **Reports.**

4.2.1 Grantee must submit a fully and accurately completed payment request to the City's Contract Manager using the City's contract management system by the deadline outlined in Exhibit B.3. Grantee must provide complete and accurate supporting documentation. Upon receipt and approval by the City of each complete and accurate payment request, the City shall process the payment to the Grantee in an amount equal to the City's payment obligations, subject to deduction for any unallowable costs.

4.2.2 Grantee shall submit a quarterly program performance report using the format and method specified by the City no later than 11:59 p.m. Central Standard Time (CST) 15 calendar days following each calendar quarter. If the 15th calendar day falls on a weekend or holiday, as outlined in Section 8.24, the deadline to submit the quarterly program performance report is extended to no later than 11:59 p.m. CST of the 1st weekday immediately following the weekend or holiday. Grantee shall provide complete and accurate supporting documentation upon request by City.  Payment Requests will not be approved if any accurate and complete performance report, including any required documentation, is past due.   Performance reports on a frequency other than quarterly may be required by the City based upon business needs.

4.2.3 An annual Contract Progress Report, using the forms in the City's contract management system , shall be completed by the Grantee and submitted to the City within 45 calendar days following the end of each Program Period..

4.2.4 A Contract Closeout Summary Report using the forms in the City's contract management system shall be completed by the Grantee and submitted to the City within 60 calendar days following the expiration or termination of this Agreement. Any encumbrances of funds incurred prior to the date of termination of this Agreement shall be subject to verification by the City. Upon termination of this Agreement, any unused funds, unobligated funds, rebates, credits, or interest earned on funds received under this Agreement shall be returned to the City.

4.2.5 Grantee shall provide the City with a copy of the completed Agency Administration Profile (AAP) using the forms in the City's contract management system, and required AAP Attachments, including a copy of the Grantee's completed Internal Revenue Service Form 990 or 990EZ (Return of Organization Exempt from Income Tax) if applicable, for each calendar year to be due in conjunction with submission of the Grantee's annual financial audit report or financial review report as outlined in Section 4.5.4. If Grantee filed a Form 990 or Form 990EZ extension request, Grantee shall provide the City with a copy of that application of extension of time to file (IRS Form 2758) within 30 days of filing said form(s), and a copy of the final IRS Form 990 document(s) immediately upon completion.

4.2.5.1 Governmental Entities are not required to submit an Agency Administration Profile to the City under this Agreement.

4.2.6 Grantee shall provide other reports required by the City to document the effective and appropriate delivery of services as outlined under this Agreement as required by the City.

4.3 **Grantee Policies and Procedures.**

4.3.1 Grantee shall maintain written policies and procedures aligned with best practices and approved by its governing body and shall make copies of all policies and procedures available to the City upon request. At a minimum, written policies shall exist in the following areas: Financial Management; Subcontracting and/or Procurement; Equal Employment Opportunity; Personnel and Personnel Grievance; Nepotism; Non-Discrimination of Clients; Client Grievance; Drug Free Workplace; the Americans with Disabilities Act; Conflict of Interest; Whistleblower; and Criminal Background Checks.

4.3.2 Grantee shall provide the City with copies of revised Articles of Incorporation and Doing Business As (*DBA*) certificates (if applicable) within 14 calendar days of receipt of the notice of filing by the Secretary of State's office. Grantee shall provide the City with copies of revised By-Laws within 14 calendar days of their approval by the Grantee's governing body.

4.4 **Monitoring and Evaluation.**

4.4.1 Grantee agrees that the City or its designee may carry out monitoring and evaluation activities to ensure adherence by the Grantee and Subgrantees to the Program Work Statement, Program Performance Measures, and Program Budget, as well as other provisions of this Agreement. Grantee shall fully cooperate in any monitoring or review by the City and further agrees to designate a staff member to coordinate monitoring and evaluation activities.

4.4.2 The City expressly reserves the right to monitor client-level data related to services provided under this Agreement. If the Grantee asserts that client-level data is legally protected from disclosure to the City, a specific and valid legal reference to this assertion must be provided and is subject to acceptance by the City's Law Department.

4.4.3 Grantee shall provide the City with copies of all evaluation or monitoring reports received from other funding sources during the Agreement Term upon request following the receipt of the final report.

4.4.4 Grantee shall keep on file copies of all notices of Board of Directors meetings, Subcommittee or Advisory Board meetings, and copies of approved minutes of those meetings.

4.5 **Financial Audit of Grantee.**

4.5.1  Grantee shall annually contract with an independent auditor utilizing a Letter of Engagement to complete either a full financial audit or financial review. The auditor must be a Certified Public Accountant recognized by the regulatory authority of the State of Texas.

4.5.1.1  Governmental Entities are not required to submit a financial audit to the City under this Agreement.

4.5.2  In the event Grantee expends $750,000 or more in a year in federal awards, Grantee shall have a single or program specific audit conducted in accordance with Chapter 200, Subpart F, of Title 2 of the Code of Federal Regulations as required by the Single Audit Act of 1984, as amended (Single Audit Act), and shall submit to the City a complete set of audited financial statements and the auditor's opinion and management letters in accordance with Chapter 200, Subpart F, of Title 2 of the Code of Federal Regulations and any guidance issued by the federal Office of Management and Budget covering Grantee's fiscal year until the end of the term of this Agreement.

4.5.3  If Grantee is not subject to the Single Audit Act, and expends $750,000 or more during the Grantee's fiscal year, then Grantee shall have a full financial audit performed in accordance with Generally Accepted Auditing Standards (GAAS). If less than $750,000 is expended, then a financial review is acceptable, pursuant to the requirements of this Agreement.

4.5.4  Grantee shall submit a complete financial audit report or financial review which has been presented and accepted by the Board of Directors, to include the original auditor Opinion Letter/Independent Auditor's Report within 270 calendar days of the end of Grantee's fiscal year, unless alternative arrangements are approved in writing by the City. The financial audit report or financial review report must include the Management Letter/Internal Controls Letter, if one was issued by the auditor.

4.5.5  Grantee shall submit an APH Board Certification Form that was signed and dated by the Grantee's Board Chair. The APH Board Certification Form confirms that the independent auditor presented the financial audit or financial review to the Grantee's Board or committee of the Board and that it was accepted by the Grantee's Board of Directors or a committee of the Board. The City will deem the financial audit report/financial review report incomplete if the Grantee fails to submit the Board Certification form, as required by this Section.

4.5.6  The inclusion of any Findings or a Going Concern Uncertainty, as defined by Chapter 200, Subpart F, of Title 2 of the Code of Federal Regulations and GAAS, in a Grantee's audit requires the creation and submission to the City of a corrective action plan formally approved by the Grantee's governing board. The plan must be submitted to the City within 60 days after the audit is submitted to the City. Failure to submit an adequate plan to the City may result in the immediate suspension of funding. If adequate improvement related to the audit findings is not documented within a reasonable period of time, the City may provide additional technical assistance, refer the Agreement to the City Auditor for analysis, or move to terminate the Agreement as specified in Section 5 of the Agreement.

4.5.7  The expiration or termination of this Agreement shall in no way relieve the Grantee of the audit requirement set forth in this Section.

4.5.8  **Right To Audit By Office of City Auditor.**

4.5.8.1  Grantee agrees that the representatives of the Office of the City Auditor, or other authorized representatives of the City, shall have access to, and the right to audit, examine, and copy any and all records of the Grantee related to the performance under this Agreement during normal business hours (Monday – Friday, 8 am – 5 pm). In addition to any other rights of termination or suspension set forth herein, the City shall have the right to immediately suspend the Agreement, upon written notice to Grantee, if Grantee fails to cooperate with this audit provision. The Grantee shall retain all such records for a period of 5 years after the expiration or early termination of this Agreement or until all audit and litigation matters that the City has brought to the attention of the Grantee are resolved, whichever is longer. The Grantee agrees to refund to the City any overpayments disclosed by any such audit.

4.5.8.2 Grantee shall include this audit requirement in any subagreements entered into in connection with this Agreement.

## SECTION 5.  TERMINATION

5.1  **Right To Assurance.**  Whenever one party to the Agreement in good faith has reason to question the other party's intent to perform, demand may be made to the other party for written assurance of the intent to perform.  In the event that no assurance is given within the time specified after demand is made, the demanding party may treat this failure as an anticipatory repudiation of the Agreement.

5.2  **Default.**  The Grantee shall be in default under the Agreement if the Grantee (a) fails to fully, timely and faithfully perform any of its material obligations under the Agreement, (b) fails to provide adequate assurance of performance under the "Right to Assurance" paragraph herein, (c) becomes insolvent or seeks relief under the bankruptcy laws of the United States or (d) makes a material misrepresentation in Grantee's Offer, or in any report or deliverable required to be submitted by Grantee to the City.

5.3  **Termination For Cause.**  In the event of a default by the Grantee, the City shall have the right to terminate the Agreement for cause, by written notice effective 10 calendar days, unless otherwise specified, after the date of such notice, unless the Grantee, within such 10 day period, cures such default, or provides evidence sufficient to prove to the City's reasonable satisfaction that such default does not, in fact, exist. The City may place Grantee on probation for a specified period of time within which the Grantee must correct any non-compliance issues. Probation shall not normally be for a period of more than 9 months; however, it may be for a longer period, not to exceed 1 year depending on the circumstances. If the City determines the Grantee has failed to perform satisfactorily during the probation period, the City may proceed with suspension. In the event of a default by the Grantee, the City may suspend or debar the Grantee in accordance with the "City of Austin Purchasing Office Probation, Suspension and Debarment Rules for Vendors" and remove the Grantee from the City's vendor list for up to 5 years and any Offer submitted by the Grantee may be disqualified for up to 5 years. In addition to any other remedy available under law or in equity, the City shall be entitled to recover all actual damages, costs, losses and expenses, incurred by the City as a result of the Grantee's default, including, without limitation, cost of cover, reasonable attorneys' fees, court costs, and prejudgment and post-judgment interest at the maximum lawful rate. All rights and remedies under the Agreement are cumulative and are not exclusive of any other right or remedy provided by law.

5.4  **Termination Without Cause.**  The City shall have the right to terminate the Agreement, in whole or in part, without cause any time upon 30 calendar-days prior written notice.  Upon receipt of a notice of termination, the Grantee shall promptly cease all further work pursuant to the Agreement, with such exceptions, if any, specified in the notice of termination.  The City shall pay the Grantee, to the extent of funds appropriated or otherwise legally available for such purposes, for all goods delivered and services performed and obligations incurred prior to the date of termination in accordance with the terms hereof.

5.5  **Fraud.**  Fraudulent statements by the Grantee on any Offer or in any report or deliverable required to be submitted by the Grantee to the City shall be grounds for the termination of the Agreement for cause by the City and may result in legal action.

## SECTION 6.   OTHER DELIVERABLES

6.1  **Insurance.**  The following insurance requirements apply:

### 6.1.1   **General Requirements**

6.1.1.1    The Grantee shall at a minimum carry insurance in the types and amounts indicated herein for the duration of the Agreement and during any warranty period.

6.1.1.2    The Grantee shall provide a Certificate of Insurance as verification of coverages required below to the City at the below address prior to Agreement execution and within 14 calendar days after written request from the City.

6.1.1.3 The Grantee must also forward a Certificate of Insurance to the City whenever a previously identified policy period has expired, or an extension option or holdover period is exercised, as verification of continuing coverage.

6.1.1.4 The Grantee shall not commence work until the required insurance is obtained and has been reviewed by the City. Approval of insurance by the City shall not relieve or decrease the liability of the Grantee hereunder and shall not be construed to be a limitation of liability on the part of the Grantee.

6.1.1.5 The Grantee must maintain and make available to the City, upon request, Certificates of Insurance for all Subgrantees.

6.1.1.6 The Grantee's and all Subgrantees' insurance coverage shall be written by companies licensed to do business in the State of Texas at the time the policies are issued and shall be written by companies with A.M. Best ratings of B+VII or better. The City will accept workers' compensation coverage written by the Texas Workers' Compensation Insurance Fund.

6.1.1.7 All endorsements naming the City as additional insured, waivers, and notices of cancellation endorsements as well as the Certificate of Insurance shall contain the Grantee's email address, and shall be mailed to the following address:

> City of Austin
> Austin Public Health
> ATTN: Social Services Contracts
> P. O. Box 1088
> Austin, Texas 78767

6.1.1.8 The "other" insurance clause shall not apply to the City where the City is an additional insured shown on any policy. It is intended that policies required in the Agreement, covering both the City and the Grantee, shall be considered primary coverage as applicable.

6.1.1.9 If insurance policies are not written for amounts specified, the Grantee shall carry Umbrella or Excess Liability Insurance for any differences in amounts specified. If Excess Liability Insurance is provided, it shall follow the form of the primary coverage.

6.1.1.10 The City shall be entitled, upon request, at an agreed upon location, and without expense, to review certified copies of policies and endorsements thereto and may make any reasonable requests for deletion or revision or modification of particular policy terms, conditions, limitations, or exclusions except where policy provisions are established by law or regulations binding upon either of the parties hereto or the underwriter on any such policies.

6.1.1.11 The City reserves the right to review the insurance requirements set forth during the effective period of the Agreement and to make reasonable adjustments to insurance coverage, limits, and exclusions when deemed necessary and prudent by the City based upon changes in statutory law, court decisions, the claims history of the industry or financial condition of the insurance company as well as the Grantee.

6.1.1.12 The Grantee shall not cause any insurance to be canceled nor permit any insurance to lapse during the term of the Agreement or as required in the Agreement.

6.1.1.13 The Grantee shall be responsible for premiums, deductibles and self-insured retentions, if any, stated in policies. All deductibles or self-insured retentions shall be disclosed on the Certificate of Insurance.

6.1.1.14 The Grantee shall endeavor to provide the City 30 calendar-days written notice of erosion of the aggregate limits below occurrence limits for all applicable coverages indicated within the Agreement.

6.1.2 **Specific Coverage Requirements.** The Grantee shall at a minimum carry insurance in the types and amounts indicated below for the duration of the Agreement, including extension options

and hold over periods, and during any warranty period. These insurance coverages are required minimums and are not intended to limit the responsibility or liability of the Grantee.

6.1.2.1 **Commercial General Liability Insurance**. The minimum bodily injury and property damage per occurrence are $500,000* for coverages A (Bodily Injury and Property Damage) and B (Personal and Advertising Injuries). The policy shall contain the following provisions and endorsements.

6.1.2.1.1 Blanket contractual liability coverage for liability assumed under the Agreement and all other Agreements related to the project

6.1.2.1.2 Independent Grantee's Coverage

6.1.2.1.3 Products/Completed Operations Liability for the duration of the warranty period

6.1.2.1.4 Waiver of Subrogation, Endorsement CG 2404, or equivalent coverage

6.1.2.1.5 Thirty (30) calendar-days' Notice of Cancellation, Endorsement CG 0205, or equivalent coverage

6.1.2.1.6 The "City of Austin" listed as an additional insured, Endorsement CG 2010, or equivalent coverage

6.1.2.1.7 If care of a child is provided outside the presence of a legal guardian or parent, Grantee shall provide coverage for sexual abuse and molestation for a minimum limit of $500,000 per occurrence.

6.1.2.1.8 The policy shall be endorsed to cover injury to a child while the child is in the care of the Grantee or Subgrantee.

\* Supplemental Insurance Requirement. If eldercare, childcare, or housing for clients is provided, the required limits shall be $1,000,000 per occurrence.

6.1.2.2 **Business Automobile Liability Insurance**.

Minimum limits: *$500,000* combined single limit per occurrence for all owned, hired and non-owned autos

a. a. If any form of transportation for clients is provided, coverage for all owned, non-owned, and hired vehicles shall be maintained with a combined single limit of $1,000,000 per occurrence.

b. If Grantee does not own any vehicles, a signed "Hired & Non-Owned Auto" Statement may be provided in conjunction with evidence of non-owned and hired Business Automobile Liability Insurance coverage.

c. b. If no client transportation is provided but autos are used within the scope of work, and there are no agency owned vehicles, evidence of Personal Auto Policy coverage from each person using their auto may be provided. The following limits apply for personal auto insurance: $100,000/$300,000/$100,000.

All policies shall contain the following endorsements:

6.1.2.2.1. Waiver of Subrogation, Endorsement CA 0444, or equivalent coverage

6.1.2.2.2. Thirty (30) calendar-days' Notice of Cancellation, Endorsement CA 0244, or equivalent coverage

6.1.2.2.3 The "City of Austin" listed as an additional insured, Endorsement CA 2048, or equivalent coverage

6.1.2.3 **Worker's Compensation and Employers' Liability Insurance**. Coverage is required of Grantees providing services on City owned or leased property, and shall be consistent with statutory benefits outlined in the Texas Worker's Compensation Act (Section 401). The minimum policy limits for Employer's Liability are $100,000 bodily injury each accident, $500,000 bodily injury by disease policy limit and $100,000 bodily injury by disease each employee. The policy shall contain the following provisions and endorsements:

      6.1.2.3.1    The Grantee's policy shall apply to the State of Texas

      6.1.2.3.2    Waiver of Subrogation, Form WC 420304, or equivalent coverage

      6.1.2.3.3    Thirty (30) calendar-days' Notice of Cancellation, Form WC 420601, or equivalent coverage

6.1.2.4    **Professional Liability Insurance**.

    6.1.2.4.1  Grantee shall provide coverage at a minimum limit of $500,000 per claim to pay on behalf of the assured all sums which the assured shall become legally obligated to pay as damages by reason of any negligent act, error, or omission arising out of the performance of professional services under this Agreement.

    6.1.2.4.2  If coverage is written on a claims-made basis, the retroactive date shall be prior to or coincident with the date of the Agreement and the certificate of insurance shall state that the coverage is claims-made and indicate the retroactive date. This coverage shall be continuous and will be provided for 24 months following the completion of the Agreement.

6.1.2.5    **Blanket Crime Policy Insurance**. A Blanket Crime Policy shall be required with limits equal to or greater than the sum of all Agreement funds allocated annually by the City. Acceptance of alternative limits shall be approved by Risk Management.

6.1.2.6    **Directors and Officers Insurance**. Directors and Officers Insurance with a minimum of not less than $1,000,000 per claim shall be in place for protection from claims arising out of negligent acts, errors or omissions for directors and officers while acting in their capacities as such. If coverage is underwritten on a claims-made basis, the retroactive date shall be coincident with or prior to the date of the Agreement and the certificate of insurance shall state that the coverage is claims made and the retroactive date. The coverage shall be continuous for the duration of the Agreement and for not less than 24 months following the end of the Agreement. Coverage, including renewals, shall have the same retroactive date as the original policy applicable to the Agreement or evidence of prior acts or an extended reporting period acceptable to the City may be provided. The Grantee shall, on at least an annual basis, provide the City with a Certificate of Insurance as evidence of such insurance.

6.1.2.7    **Property Insurance**. If the Agreement provides funding for the purchase of property or equipment the Grantee shall provide evidence of all risk property insurance for a value equivalent to the replacement cost of the property or equipment.

6.1.2.8    **Endorsements**. The specific insurance coverage endorsements specified above, or their equivalents, must be provided. In the event that endorsements, which are the equivalent of the required coverage, are proposed to be substituted for the required coverage, copies of the equivalent endorsements must be provided for the City's review and approval.

6.1.2.9    **Certificate**. The following statement must be shown on the Certificate of Insurance.

"The City of Austin is an Additional Insured on the general liability and the auto liability policies. A Waiver of Subrogation is issued in favor of the City of Austin for general liability, auto liability and workers compensation policies."

## 6.2 Equal Opportunity.

6.2.1 **Equal Employment Opportunity.** No Grantee or Grantee's agent shall engage in any discriminatory employment practice as defined in Chapter 5-4 of the City Code. No Bid submitted to the City shall be considered, nor any Purchase Order issued, or any Agreement awarded by the City unless the Grantee has executed and filed with the City Purchasing Office a current Non-Discrimination Certification. The Grantee shall sign and return the Non-Discrimination Certification attached hereto as Exhibit C. Non-compliance with Chapter 5-4 of the City Code may result in sanctions, including termination of the Agreement and the Grantee's suspension or debarment from participation on future City Agreements until deemed compliant with Chapter 5-4. Any Subgrantees used in the performance of this Agreement and paid with City funds must comply with the same nondiscrimination requirements as the Grantee.

6.2.2 **Americans with Disabilities Act (ADA) Compliance.** No Grantee, or Grantee's agent shall engage in any discriminatory employment practice against individuals with disabilities as defined in the ADA.

6.3 **Inspection of Premises.** The City has the right to enter Grantee's and Subgrantee's work facilities and premises during Grantee's regular work hours, and Grantee agrees to facilitate a review of the facilities upon reasonable request by the City.

6.4 **Rights to Proposal and Contractual Material.** All material submitted by the Grantee to the City shall become property of the City upon receipt. Any portions of such material claimed by the Grantee to be proprietary must be clearly marked as such. Determination of the public nature of the material is subject to the Texas Public Information Act, Chapter 552, Texas Government Code.

6.5 **Publications.** All published material and written reports submitted under the Agreement must be originally developed material unless otherwise specifically provided in the Agreement. When material not originally developed is included in a report in any form, the source shall be identified.

## SECTION 7.   WARRANTIES

7.1 **Authority.** Each party warrants and represents to the other that the person signing this Agreement on its behalf is authorized to do so, that it has taken all action necessary to approve this Agreement, and that this Agreement is a lawful and binding obligation of the party.

7.2 **Performance Standards.** Grantee warrants and represents that all services provided under this Agreement shall be fully and timely performed in a good and workmanlike manner in accordance with generally accepted community standards and, if applicable, professional standards and practices. Grantee may not limit, exclude, or disclaim this warranty or any warranty implied by law, and any attempt to do so shall be without force or effect. If the Grantee is unable or unwilling to perform its services in accordance with the above standard as required by the City, then in addition to any other available remedy, the City may reduce the amount of services it may be required to purchase under the Agreement from the Grantee, and purchase conforming services from other sources. In such event, the Grantee shall pay to the City upon demand the increased cost, if any, incurred by the City to procure such services from another source. Grantee agrees to participate with City staff to update the performance measures.

## SECTION 8.   MISCELLANEOUS

8.1 **Criminal Background Checks.** Grantee and Subgrantee(s) agree to perform a criminal background check on individuals providing direct client services in programs designed for children under 18 years of age, seniors 55 years of age and older, or persons with Intellectual and Developmental Disabilities (IDD). Grantee shall not assign or allow an individual to provide direct client service in programs designed for children under 18 years of age, seniors 55 years of age and older, or persons with IDD if the individual

would be barred from contact under the applicable program rules established by Title 40 of the Texas Administrative Code.

8.1.1  In accordance with the Grantee's personnel and records retention policies, the Grantee shall retain documentation that a criminal background check was completed.

8.2  **Compliance with Health, Safety, and Environmental Regulations.** The Grantee, its Subgrantees, and their respective employees, shall comply fully with all applicable federal, state, and local health, safety, and environmental laws, ordinances, rules and regulations in the performance of the services, including but not limited to those promulgated by the City and by the Occupational Safety and Health Administration (OSHA), and those found in the Clean Air Act (42 U.S.C. 7401–7671q), the Federal Water Pollution Control Act as amended (33 U.S.C. 1251–1387), and the Energy Policy and Conservation Act (42 U.S.C. 6201). In case of conflict, the most stringent safety requirement shall govern. The Grantee shall indemnify and hold the City harmless from and against all claims, demands, suits, actions, judgments, fines, penalties and liability of every kind arising from the breach of the Grantee's obligations under this paragraph.

8.2.1  The Grantee or Subgrantee(s) seeking an exemption for a food enterprise permit fee must present this signed and executed social services Agreement upon request to the City. (*Source: City of Austin Ordinance 20051201-013*)

8.3  **Stop Work Notice.** The City may issue an immediate Stop Work Notice in the event the Grantee is observed performing in a manner that the City reasonably believes is in violation of federal, state, or local guidelines, or in a manner that is determined by the City to be unsafe to either life or property.  Upon notification, the Grantee will cease all work until notified by the City that the violation or unsafe condition has been corrected.  The Grantee shall be liable for all costs incurred by the City as a result of the issuance of such Stop Work Notice.

8.4  **Indemnity.**

8.4.1  Definitions:

8.4.1.1  "Indemnified Claims" shall include any and all claims, demands, suits, causes of action, judgments and liability of every character, type or description, including all reasonable costs and expenses of litigation, mediation or other alternate dispute resolution mechanism, including attorney and other professional fees for:

8.4.1.1.1  damage to or loss of the property of any person (including, but not limited to the City, the Grantee, their respective agents, officers, employees and Subgrantees; the officers, agents, and employees of such Subgrantees; and third parties); and/or;

8.4.1.1.2  death, bodily injury, illness, disease, worker's compensation, loss of services, or loss of income or wages to any person (including but not limited to the agents, officers and employees of the City, the Grantee, the Grantee's Subgrantees, and third parties),

8.4.1.2  "Fault" shall include the sale of defective or non-conforming deliverables, negligence, willful misconduct, or a breach of any legally imposed strict liability standard.

8.4.2  THE GRANTEE SHALL DEFEND (AT THE OPTION OF THE CITY), INDEMNIFY, AND HOLD THE CITY, ITS SUCCESSORS, ASSIGNS, OFFICERS, EMPLOYEES AND ELECTED OFFICIALS HARMLESS FROM AND AGAINST ALL INDEMNIFIED CLAIMS DIRECTLY ARISING OUT OF, INCIDENT TO, CONCERNING OR RESULTING FROM THE FAULT OF THE GRANTEE, OR THE GRANTEE'S AGENTS, EMPLOYEES OR SUBGRANTEES, IN THE PERFORMANCE OF THE GRANTEE'S OBLIGATIONS UNDER THE AGREEMENT.  NOTHING HEREIN SHALL BE DEEMED TO LIMIT THE RIGHTS OF THE CITY OR THE GRANTEE (INCLUDING, BUT NOT LIMITED TO, THE RIGHT TO SEEK CONTRIBUTION) AGAINST ANY THIRD PARTY WHO MAY BE LIABLE FOR AN INDEMNIFIED CLAIM.

8.5  **Claims.**  If any claim, demand, suit, or other action is asserted against the Grantee which arises under or concerns the Agreement, or which could have a material adverse effect on the Grantee's ability to perform hereunder, the Grantee shall give written notice thereof to the City within 10 calendar days after receipt of notice by the Grantee.  Such notice to the City shall state the date of notification of any such

claim, demand, suit, or other action; the names and addresses of the claimant(s); the basis thereof; and the name of each person against whom such claim is being asserted. Such notice shall be delivered personally or by mail and shall be sent to the City and to the Austin City Attorney. Personal delivery to the City Attorney shall be to City Hall, 301 West 2nd Street, 4th Floor, Austin, Texas 78701, and mail delivery shall be to P.O. Box 1088, Austin, Texas 78767.

8.6 **Business Continuity.** Grantee warrants that it has adopted a business continuity plan that describes how Grantee will continue to provide services in the event of an emergency or other unforeseen event, and agrees to maintain the plan on file for review by the City. Grantee shall provide a copy of the plan to the City's Contract Manager upon request at any time during the term of this Agreement, and the requested information regarding the Business Continuity Plan shall appear in the annual AAP documentation.

8.6.1 Grantee agrees to participate in the City's Emergency Preparedness and Response Plan and other disaster planning processes. Grantee participation includes assisting the City to provide disaster response and recovery assistance to individuals and families impacted by manmade or natural disasters.

8.7 **Notices.** Unless otherwise specified, all notices, requests, or other communications required or appropriate to be given under the Agreement shall be in writing and shall be deemed delivered 3 business days after postmarked if sent by U.S. Postal Service Certified or Registered Mail, Return Receipt Requested. Notices delivered by other means shall be deemed delivered upon receipt by the addressee. Routine communications may be made by first class mail, email, or other commercially accepted means. Notices to the City and the Grantee shall be addressed as follows:

| To the City: | To the Grantee: | With copy to: |
|---|---|---|
| City of Austin<br>Austin Public Health<br>Health Equity and Community<br>Engagement Division | Central Texas Allied Health<br>Institute | City of Austin<br>Austin Public Health |
| ATTN: Adrienne Sturrup,<br>Assistant Director | ATTN: Todd Hamilton,<br>Campus Director | ATTN: Stephanie Hayden,<br>Director |
| 7201 Levander Loop, Bldg. E | 2101 E St Elmo Rd. | 7201 Levander Loop, Bldg. E |
| Austin, TX 78702 | Austin, TX 78744 | Austin, TX 78702 |

8.8 **Confidentiality.** In order to provide the deliverables to the City, Grantee may require access to certain of the City's and/or its licensors' confidential information (including inventions, employee information, trade secrets, confidential know-how, confidential business information, and other information which the City or its licensors consider confidential) (collectively, "Confidential Information"). Grantee acknowledges and agrees that the Confidential Information is the valuable property of the City and/or its licensors and any unauthorized use, disclosure, dissemination, or other release of the Confidential Information will substantially injure the City and/or its licensors. The Grantee (including its employees, Subgrantees, agents, or representatives) agrees that it will maintain the Confidential Information in strict confidence and shall not disclose, disseminate, copy, divulge, recreate, or otherwise use the Confidential Information without the prior written consent of the City or in a manner not expressly permitted under this Agreement, unless the Confidential Information is required to be disclosed by law or an order of any court or other governmental authority with proper jurisdiction, provided the Grantee promptly notifies the City before disclosing such information so as to permit the City reasonable time to seek an appropriate protective order. The Grantee agrees to use protective measures no less stringent than the Grantee uses within its own business to protect its own most valuable information, which protective measures shall under all circumstances be at least reasonable measures to ensure the continued confidentiality of the Confidential Information.

8.9 **Advertising.** Where such action is appropriate as determined by the City, Grantee shall publicize the activities conducted by the Grantee under this Agreement. Any news release, sign, brochure, or other advertising medium including websites disseminating information prepared or distributed by or for the Grantee shall recognize the City as a funding source and include a statement that indicates that the information presented does not officially represent the opinion or policy position of the City.

8.10 **No Contingent Fees.** The Grantee warrants that no person or selling agency has been employed or retained to solicit or secure the Agreement upon any agreement or understanding for commission, percentage, brokerage, or contingent fee, excepting bona fide employees of bona fide established commercial or selling agencies maintained by the Grantee for the purpose of securing business. For breach or violation of this warranty, the City shall have the right, in addition to any other remedy available, to cancel the Agreement without liability and to deduct from any amounts owed to the Grantee, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

8.11 **Gratuities.** The City may, by written notice to the Grantee, cancel the Agreement without liability if it is determined by the City that gratuities were offered or given by the Grantee or any agent or representative of the Grantee to any officer or employee of the City with a view toward securing the Agreement or securing favorable treatment with respect to the awarding or amending or the making of any determinations with respect to the performing of such Agreement. In the event the Agreement is canceled by the City pursuant to this provision, the City shall be entitled, in addition to any other rights and remedies, to recover or withhold the amount of the cost incurred by the Grantee in providing such gratuities.

8.12 **Prohibition Against Personal Interest in Agreements.** No officer, employee, independent consultant, or elected official of the City who is involved in the development, evaluation, or decision-making process of the performance of any solicitation shall have a financial interest, direct or indirect, in the Agreement resulting from that solicitation. Any willful violation of this Section shall constitute impropriety in office, and any officer or employee guilty thereof shall be subject to disciplinary action up to and including dismissal. Any violation of this provision, with the knowledge, expressed or implied, of the Grantee shall render the Agreement voidable by the City.

8.13 **Independent Grantee.** The Agreement shall not be construed as creating an employer/employee relationship, a partnership, or a joint venture. The Grantee's services shall be those of an independent Grantee. The Grantee agrees and understands that the Agreement does not grant any rights or privileges established for employees of the City.

8.14 **Assignment-Delegation.** The Agreement shall be binding upon and inure to the benefit of the City and the Grantee and their respective successors and assigns, provided however, that no right or interest in the Agreement shall be assigned and no obligation shall be delegated by the Grantee without the prior written consent of the City. Any attempted assignment or delegation by the Grantee shall be void unless made in conformity with this paragraph. The Agreement is not intended to confer rights or benefits on any person, firm or entity not a party hereto; it being the intention of the parties that there be no third party beneficiaries to the Agreement.

8.15 **Waiver.** No claim or right arising out of a breach of the Agreement can be discharged in whole or in part by a waiver or renunciation of the claim or right unless the waiver or renunciation is supported by consideration and is in writing signed by the aggrieved party. No waiver by either the Grantee or the City of any one or more events of default by the other party shall operate as, or be construed to be, a permanent waiver of any rights or obligations under the Agreement, or an express or implied acceptance of any other existing or future default or defaults, whether of a similar or different character.

8.16 **Modifications.** The Agreement can be modified or amended only by a written, signed agreement by both parties. No pre-printed or similar terms on any Grantee invoice, order, or other document shall have any force or effect to change the terms, covenants, and conditions of the Agreement.

8.17 **Interpretation.** The Agreement is intended by the parties as a final, complete and exclusive statement of the terms of their agreement. No course of prior dealing between the parties or course of performance or usage of the trade shall be relevant to supplement or explain any term used in the Agreement. Although the Agreement may have been substantially drafted by one party, it is the intent of the parties that all provisions be construed in a manner to be fair to both parties, reading no provisions more strictly against one party or the other. Whenever a term defined by the Uniform Commercial Code, as enacted by the State of Texas, is used in the Agreement, the UCC definition shall control, unless otherwise defined in the Agreement.

8.18 **Dispute Resolution.**

8.18.1 If a dispute arises out of or relates to the Agreement, or the breach thereof, the parties agree to negotiate prior to prosecuting a suit for damages. However, this section does not prohibit the filing

of a lawsuit to toll the running of a statute of limitations or to seek injunctive relief. Either party may make a written request for a meeting between representatives of each party within 14 calendar days after receipt of the request or such later period as agreed by the parties. Each party shall include, at a minimum, 1 senior level individual with decision-making authority regarding the dispute. The purpose of this and any subsequent meeting is to attempt in good faith to negotiate a resolution of the dispute. If, within 30 calendar days after such meeting, the parties have not succeeded in negotiating a resolution of the dispute, they will proceed directly to mediation as described below. Negotiation may be waived by a written agreement signed by both parties, in which event the parties may proceed directly to mediation as described below.

8.18.2 If the efforts to resolve the dispute through negotiation fail, or the parties waive the negotiation process, the parties may select, within 30 calendar days, a mediator trained in mediation skills to assist with resolution of the dispute. Should they choose this option, the City and the Grantee agree to act in good faith in the selection of the mediator and to give consideration to qualified individuals nominated to act as mediator. Nothing in the Agreement prevents the parties from relying on the skills of a person who is trained in the subject matter of the dispute or an Agreement interpretation expert. If the parties fail to agree on a mediator within 30 calendar days of initiation of the mediation process, the mediator shall be selected by the Travis County Dispute Resolution Center (DRC). The parties agree to participate in mediation in good faith for up to 30 calendar days from the date of the first mediation session. The City and the Grantee will share the mediator's fees equally and the parties will bear their own costs of participation such as fees for any consultants or attorneys they may utilize to represent them or otherwise assist them in the mediation.

## 8.19 **Minority and Women Owned Business Enterprise (MBE/WBE) Procurement Program**

MBE/WBE goals do not apply to this Agreement.

## 8.20 **Living Wage Policy (If Applicable)**

The City's Living Wage Program applies to City expenditure and revenue generating non-construction contracts where all of the following apply:
▪ Contract is predominantly for non-construction services *performed on City Property or on City Vehicles*;
▪ Contract results from a formal competitive solicitation, procedurally compliant with section 252.021 of the Texas Local Government Code;
▪ Contract requires authorization by City Council in accordance with Article VII, Finance, Section 15 (Purchase Procedure) of the City Charter; and
▪ Directly assigned Contractor Employees of the Prime Contractor and all tiers of subcontracting.

8.20.1 The Grantee shall maintain throughout the term of the Agreement basic employment and wage information for each employee as required by the Fair Labor Standards Act (FLSA).
8.20.2 The Grantee shall provide the Department's Contract Manager with the first invoice, individual Employee Certifications for all employees directly assigned to the Agreement. The City reserves the right to request individual Employee Certifications at any time during the Agreement term. Employee Certifications shall be signed by each employee directly assigned to the Agreement. The Employee Certification form is available on-line at:
https://www.austintexas.gov/financeonline/vendor_connection/index.cfm.
8.20.3 Grantee shall submit employee certifications annually on the anniversary date of Agreement award with the respective invoice to verify that employees are paid the Living Wage throughout the term of the Agreement. The Employee Certification Forms shall be submitted for employees added to the Agreement and/or to report any employee changes as they occur.
8.20.4 The Department's Contract Manager will periodically review the employee data submitted by the Grantee to verify compliance with this Living Wage provision. The City retains the right to review employee records required in paragraph 8.20.1 above to verify compliance with this provision.

## 8.21 **Subgrantees.**

8.21.1 Work performed for the Grantee by a Subgrantee shall be pursuant to a written Agreement between the Grantee and Subgrantee. The terms of the Subagreement may not conflict with the terms of the Agreement, and shall contain provisions that:

8.21.1.1 require that all deliverables to be provided by the Subgrantee be provided in strict accordance with the provisions, specifications and terms of the Agreement. The City may require specific documentation to confirm Subgrantee compliance with all aspects of this Agreement.

8.21.1.2 prohibit the Subgrantee from further subcontracting any portion of the Agreement without the prior written consent of the City and the Grantee. The City may require, as a condition to such further subcontracting, that the Subgrantee post a payment bond in form, substance and amount acceptable to the City;

8.21.1.3 require Subgrantees to submit all requests for payment and applications for payments, including any claims for additional payments, damages or otherwise, to the Grantee in sufficient time to enable the Grantee to include the same with its invoice or application for payment to the City in accordance with the terms of the Agreement;

8.21.1.4 require that all Subgrantees obtain and maintain, throughout the term of their Subagreement, insurance in the type required by this Agreement, and in amounts appropriate for the amount of the Subagreement, with the City being a named insured as its interest shall appear;

8.21.1.5 require that the Subgrantees indemnify and hold the City harmless to the same extent as the Grantee is required to indemnify the City; and

8.21.1.6 maintain and make available to the City, upon request, Certificates of Insurance for all Subgrantees.

8.21.2 The Grantee shall be fully responsible to the City for all acts and omissions of the Subgrantees just as the Grantee is responsible for the Grantee's own acts and omissions. Nothing in the Agreement shall create for the benefit of any such Subgrantee any contractual relationship between the City and any such Subgrantee, nor shall it create any obligation on the part of the City to pay or to see to the payment of any moneys due any such Subgrantee except as may otherwise be required by law.

8.21.3 The Grantee shall pay each Subgrantee its appropriate share of payments made to the Grantee not later than 10 days after receipt of payment from the City.

8.22 **Jurisdiction and Venue.** The Agreement is made under and shall be governed by the laws of the State of Texas, including, when applicable, the Uniform Commercial Code as adopted in Texas, V.T.C.A., Bus. & Comm. Code, Chapter 1, excluding any rule or principle that would refer to and apply the substantive law of another state or jurisdiction. All issues arising from this Agreement shall be resolved in the courts of Travis County, Texas and the parties agree to submit to the exclusive personal jurisdiction of such courts. The foregoing, however, shall not be construed or interpreted to limit or restrict the right or ability of the City to seek and secure injunctive relief from any competent authority as contemplated herein.

8.23 **Invalidity.** The invalidity, illegality, or unenforceability of any provision of the Agreement shall in no way affect the validity or enforceability of any other portion or provision of the Agreement. Any void provision shall be deemed severed from the Agreement and the balance of the Agreement shall be construed and enforced as if the Agreement did not contain the particular portion or provision held to be void. The parties further agree to reform the Agreement to replace any stricken provision with a valid provision that comes as close as possible to the intent of the stricken provision. The provisions of this Section shall not prevent this entire Agreement from being void should a provision which is the essence of the Agreement be determined to be void.

8.24 **Holidays.** The following holidays are observed by the City:

| HOLIDAY | DATE OBSERVED |
|---------|---------------|
| New Year's Day | January 1 |
| Martin Luther King, Jr's Birthday | Third Monday in January |

| President's Day | Third Monday in February |
|---|---|
| Memorial Day | Last Monday in May |
| Independence Day | July 4 |
| Labor Day | First Monday in September |
| Veteran's Day | November 11 |
| Thanksgiving Day | Fourth Thursday in November |
| Friday after Thanksgiving | Friday after Thanksgiving |
| Christmas Eve | December 24 |
| Christmas Day | December 25 |

If a Legal Holiday falls on Saturday, it will be observed on the preceding Friday. If a Legal Holiday falls on Sunday, it will be observed on the following Monday.

**8.25 Survivability of Obligations.** All provisions of the Agreement that impose continuing obligations on the parties, including but not limited to the warranty, indemnity, and confidentiality obligations of the parties, shall survive the expiration or termination of the Agreement.

**8.26 Non-Suspension or Debarment Certification.** The City is prohibited from contracting with or making prime or sub-awards to parties that are suspended or debarred or whose principals are suspended or debarred from federal, state, or City Agreements. By accepting an Agreement with the City, the Grantee certifies that its firm and its principals are not currently suspended or debarred from doing business with the Federal Government, as indicated by the Exclusions records at SAM.gov, the State of Texas, or the City of Austin.

**8.27 Public Information Act.** Grantee acknowledges that the City is required to comply with Chapter 552 of the Texas Government Code (Public Information Act). Under the Public Information Act, this Agreement and all related information within the City's possession or to which the City has access are presumed to be public and will be released unless the information is subject to an exception described in the Public Information Act.

**8.28 HIPAA Standards.** As applicable, Grantee and Subgrantees are required to develop and maintain administrative safeguards to ensure the confidentiality of all protected client information, for both electronic and non-electronic records, as established in the Health Insurance Portability and Accountability Act (HIPAA) Standards CFR 160 and 164, and to comply with all other applicable federal, state, and local laws and policies applicable to the confidentiality of protected client information. Grantee must maintain HIPAA-compliant Business Associate agreements with each entity with which it may share any protected client information.

    **8.28.1** Business Associate Agreement. If performance of this Agreement involves the use or disclosure of Protected Health Information (PHI), as that term is defined in 45 C.F.R. § 160.103, then Grantee acknowledges and agrees to comply with the terms and conditions contained in the Business Associate Agreement, attached as Exhibit E.

**8.29 Political and Sectarian Activity.** No portion of the funds received by the Grantee under this Agreement shall be used for any political activity (including, but not limited to, any activity to further the election or defeat of any candidate for public office) or any activity undertaken to influence the passage, defeat, or final content of legislation; or for any sectarian or religious purposes.

**8.30 Culturally and Linguistically Appropriate Standards (CLAS).** The City is committed to providing effective, equitable, understandable and respectful quality care and services that are responsive to diverse cultural beliefs and practices, preferred languages, health literacy, and other communication needs. This commitment applies to services provided directly by the City as well as services provided through its Grantees. Grantee and its Subgrantees agree to implement processes and services in a manner that is culturally and linguistically appropriate and competent. Guidance on adopting such standards and practices are available at the U.S. Department of Health and Human Services Office of Minority Health's website at: https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=1&lvlid=6.

In some instances, failure to provide language assistance services may have the effect of discriminating against persons on the basis of their natural origin. Guidelines for serving individuals with Limited English Proficiency (LEP) are available at https://www.lep.gov/faqs/faqs.html.

8.31 **Entire Agreement.** This Contract, together with the below Exhibits, and any addenda and amendments thereto constitute the entire agreement between the parties, and this Contract shall not be modified, amended, altered, or changed except with the written consent of the parties.

In witness whereof, the parties have caused duly authorized representatives to execute this Agreement on the dates set forth below.

**CENTRAL TEXAS ALLIED HEALTH INSTITUTE**          **CITY OF AUSTIN**

Signature: _Hamilton_                              Signature: _Linda Moore-Cohns_

Name: _Todd Hamilton_                              Name: _Linda Moore-Cohns_
    *Printed Name*                                       PURCHASING OFFICE

Title: _Campus President_

Date: _9/10/2020_                                  Date: _9/18/2020_


## DEFINITIONS

<u>Agreement/Contract</u>- General terms for a legally-binding undertaking between two parties that describes the terms, conditions, and specifications of the obligations, relationships, and responsibilities between them, and any related addenda and amendments. City of Austin Social Services Contracts are considered to be grant agreements, but commonly referred to as contracts. The terms are interchangeable throughout this Agreement.

<u>Exhibit</u>- An attachment to the agreement that is either programmatic (Program Exhibit) or contains additional terms and conditions (Standard Exhibit). Program Exhibits provide the detailed information for the program the City is funding through the Agreement.

<u>Governmental Entity</u>- An organization that is a unit of government, institution of higher education, or local taxing authority, such as a school district. Also includes quasi-governmental organizations, such as a local mental health authority

<u>Grantee</u>- A vendor agency that has entered into a Social Services grant agreement with the City to provide social services to the community

<u>Reimbursable Agreement</u>- An Agreement where an agency is reimbursed for expenses incurred and paid through the provision of adequate supporting documentation that verifies the expenses.

<u>Subgrantee</u>- An agency that has entered into a subagreement with a Grantee to provide direct client services under a Social Services Agreement, who is paid with City funds by the Grantee, and who must report program performance information to the Grantee for individuals served who are not existing clients of the Grantee for the contracted program. The Subgrantee is subject to the same terms and conditions in the Grantee's Social Services Agreement with the City.

## EXHIBITS

**Exhibit A – Program Forms**

    **A.1**    Program Work Statement

    **A.2**    Program Performance Measures

    **A.3**    Client Eligibility Requirements

**Exhibit B – Program Budget Forms**

    **B.1**    Program Budget and Narrative

    **B.3**    Compensation Terms

**Exhibit C – Equal Employment/Fair Housing Office/Non-Discrimination Certification, Israel Verification, and Conflicts of Interest**

**Exhibit E – Business Associate Agreement**

## Program Work Statement

### Program Goals and Objectives

Goal- Address health care delivery and workforce development during the COVID-19 pandemic and beyond in the most vulnerable population of the city. Due to the virus's high transmission rate and increasing volume of infection, there is a dire need to staff long term and short term care facilities. By providing a continuous pipeline of student externs and graduates, Central Texas Allied Health Institute (CTAHI) will work to close that gap.

Objective- To provide 100 Patient Care Technicians and Medical Assistants to test COVID-19 exposed patients at Mobile Testing Centers that have been approved by Austin Public Health.

### Program Clients Served

Central Texas Allied Health Institute is fully accredited by the Texas Workforce Commission (TWC) and all programs prepare students to sit for their national certification through both the National Healthcareer Association and the National Center for Competency Testing. CTAHI's target student population demographic is low income individuals living in the Eastern Crescent who may be eligible for job training sponsorship through the Workforce Innovation Opportunity Act (WIOA). We can be found on the Commission's Statewide Eligible Training Provider List for WIOA and state Vocational Rehabilitation job training programs.

The current student demographic of CTAHI are as follows below:

50% Hispanic
36% African American
14% White, Non-Hispanic

Central Texas Allied Health Institute offers an open recruitment process. As stated earlier, any individual in the general population is encouraged to enroll, but we do utilize a strategically focused recruitment campaign that targets the Eastern Crescent. We have partnerships with community and faith-based organization that services this population. We have made regular appearances on radio talk shows that serve this population and were featured on KXAN news. In the coming weeks will be appearing in the Austin American Statesman and on an episode of "The American Graduate" on PBS Austin.

### Program Services and Delivery

CTAHI is a private non-profit career college that provides education in the areas of allied health. Our programs are open to all citizens living in the Austin/Travis County region; however, our target audience is individuals living in vulnerable communities that historically have not had access to these type of programs at the price point of a community college. Historically, the students that enroll come from extreme poverty and have multiple stressors that affect their performance in the classroom and/or barriers to graduation. Through partnerships with Workforce Solutions Capital Area, Austin Area Urban League, Community Resilience Trust, Keep Families Giving and The Michael and Susan Dell Foundation, CTAHI strives to provide wrap around services to ensure students succeed.

A Student Success Coordinator (SSC) oversees all student retention and risk assessment reporting. This includes the early intervention program, where students are surveyed at the time of admission to determine program fit and retention level risk. If students are identified to be high risk to attrite, they meet with the SSC, their Academic Dean and their Department Chair to develop an individualized program

**Program Work Statement**

success plan. This plan identifies areas of opportunity in their path to an education and develops a mitigation to help address these issues. The student will follow this plan until they either graduate or demonstrate they have overcome these barriers and no longer need the assistance of the Student Success Office.

### System for Collecting and Reporting Program Data

Central Texas Allied Health Institute uses a proprietary student information system to collect, track and compile necessary reports for all reporting to the Texas Workforce Commission and the Michael and Susan Dell Foundation. We also utilize all report templates issued to us from our various accrediting agency. Central Texas Allied Health Institute Enrollment Application and Agreement packet contains all student data and information to complete yearly reporting requirements.

### Performance Evaluation

The agency will provide periodic assessments in the form of quizzes, tests and related assignments, as well as routine competency assessments to ensure mastery of relevant skills. CTAHI will have attendance requirements in place that students must meet depending on the program in which they are enrolled. Instructors will coordinate with the Student Success Coordinator when student are deemed at risk for attrition to determine appropriate actions if needed to help continue their education on to graduation.

The Career Services Director will work with Human Resource Departments at Austin Public Health, Community Care and other COVID-19 established medical facilities, to place students in positions specialized in COVID-19 patient care upon graduation. These positions include, paid testing and/or contact tracing staff at APH, a member of the COVID-19 response testing team at Community Care, or in any acute care center facility in Austin/Travis County that is currently caring for COVID-19 patients.

### Quality Improvement

The process for identifying obstacles begins during the Admissions stage. When speaking to prospective students, our Admissions staff uses a script that includes probing questions addressing the common issues students endure. If a member of the Admissions staff identifies a potential issue, they would complete a Student Success Referral Form and the student would be placed on the Risk Assessment Watch List, built by for our institution by the Susan and Michael Dell Foundation. Referrals can also be submitted by faculty at any time during a student's academic career at CTAHI. Another way a student is referred to the Student Success Department is through the Campus Registrar. The Registrar runs and distributes the SAP (Satisfactory Academic Progress) Report weekly in order to determine if a student may need academic assistance.

When a student is referred to the Student Success Department, they are entered in the Risk Assessment System. A student will then meet with Student Success staff for an initial appointment and paperwork. Here a student can be forthcoming with any obstacles. Additionally, each appointment will have a Summary Form. This form addresses progress gained, identified difficulties, and an action plan to overcome. Each action plan is specifically created based off of student needs and their learning style. The Summary Form will determine how frequently appointments will occur.

Lastly, upon completion of the program, a student will complete a Student Survey Form. We encourage feedback on how CTAHI can continue serving students at an exceptional level. As student progress through their externship, they will be given a periodic survey in which they have the opportunity to inform us about the quality of their externship site and the educational experience they have received.

## Program Work Statement

### *Service Coordination with Other Agencies*

CTAHI is listed on the Texas Workforce Commission State Eligible Training Provider List. This enables us to receive workforce development grant funding, for students living at or below the poverty line, for one of our three short term certificate programs under the WIOA grant. This helps students get into the workforce and move into the middle class.

### *Service Collaboration with Subgrantees*

CTAHI faculty will be onsite at all times teaching and supervising the students on how to conduct intake and testing of patients. Austin Area Urban League (AAUL) and CTAHI are providing both testing and direct social assistance services at the site., therefore AAUL is listed here as a collaborative partner in this project.

### *Community Planning Activities*

The agency is working with AAUL to provide wrap around social services to all individuals tested at our site who both 1) test positive and 2) identify and fall within the criteria of being an essential worker. The AAUL will then contact the client and begin the process of gathering information needed to provide direct and indirect financial assistance for these essential workers while they are quarantined due to COVID-19.

Students will address health care delivery and workforce development during the COVID-19 pandemic and beyond in the most vulnerable population of the city. Due to the virus's high transmission rate and increasing volume of infection, there is a dire need to staff long term and short-term care facilities. By providing a continuous pipeline of student externs and graduates, Central Texas Allied Health Institute (CTAHI) will work to close that gap.

# Program Performance

## Output - Unduplicated Clients Served

| City Goal | Other Funding Goal | Total Program Goal |
|---|---|---|
| 100 | | 100 |

## Outcomes - City Business Plan

| | | Goal |
|---|---|---|
| *(Numerator / Denominator = Rate)* | | |
| Numerator | 2Ai: Number of individuals obtaining employment | 48 |
| Demoninator | 2Ai: Number of individuals exiting the program | 80 |
| Rate | 2Ai: Percent of individuals obtaining employment | 60.00% |

| | | Goal |
|---|---|---|
| *(Numerator / Denominator = Rate)* | | |
| Numerator | 2Aii: Number of individuals increasing employment income | 48 |
| Demoninator | 2Aii: Number of individuals exiting the program | 80 |
| Rate | 2Aii: Percent of individuals increasing employment income | 60.00% |

| | | Goal |
|---|---|---|
| *(Numerator / Denominator = Rate)* | | |
| Numerator | 5A: Number of individuals who complete an educational program that improves their knowledge | 80 |
| Demoninator | 5A: Number of individuals participating in the educational program | 100 |
| Rate | 5A: Percent of individuals who complete an educational program and demonstrate improved knowledge | 80.00% |

## Outcomes - Supplemental

| WORKFORCE DEVELOPMENT, PUBLIC BENEFITS, INCREASED INCC | | Goal |
|---|---|---|
| *(Numerator / Denominator = Rate)* | | |
| Numerator | Number of clients who obtain or improve employment and retain employment after 6 months | 34 |
| Demoninator | Total number of clients who obtained their first job or improved employment 6 months prior | 48 |
| Rate | Percent of clients who obtained their first job or improved employment after 6 months; Percent of clients who obtained or improved employment and retain employment or continued post-exit pathway after 6 months | 70.83% |

# City of Austin Health and Human Services
## Social Service Contracts
## Client Eligibility Requirements

UNLESS OTHERWISE STATED IN THE CONTRACT WORK STATEMENT, THESE REQUIREMENTS APPLY TO ALL CLIENTS SERVED WITH CITY SOCIAL SERVICES FUNDING.

### GENERAL

➢ Eligibility requirements for clients served under grant contracts will be determined by the grantor.

➢ Agency must maintain a record of client eligibility (e.g. client file or electronic record) that includes documentation of:

- Annual certification of client eligibility
- Services provided to client

➢ Agency must recertify client when notified of a change in family circumstances (e.g. family income, residence, and/or family composition)

➢ Unless specified by Grant/Funding Source, re-certification of clients is required not less than once every 12 months (unless required earlier by a change in family circumstances)

➢ Homeless clients:

- If the program eligibility requires homeless status, the residency requirements and income requirements do not apply
- Homeless status must be documented by a signed (1) Homeless Eligibility Form or Homeless Self-Declaration Form and (2) entry into Homeless Management Information System (HMIS) database. These forms must be developed by the agency and be approved by the City contract manager.

➢ Other Client populations:

- Clients in programs serving victims of violence are not subject to residency or income requirements
- Eligibility exceptions for any other type of clients and/or documentation situations must be described in Contract Work Statement

➢ Date of receipt by agency must be indicated on all documentation in client file

### IDENTITY

➢ Client must provide proof of identity in order to receive City-funded services, documented by:

- A government –issued identification; or
- A signed Self-Declaration of Identity supported by client residency documentation

### RESIDENCY

➢ City-funded clients must be a resident of the City of Austin (Full Purpose Jurisdiction) and/or Travis County

- Residence must be documented by proof of address that includes client name (e.g. City utility bill, lease, letter from landlord, etc.)
- Residency eligibility must be verified by one or more of the following sources:
  - Austin GIS Jurisdictions Web Map (http://www.austintexas.gov/gis/JurisdictionsWebMap/)
  - Travis County Appraisal District website (http://www.traviscad.org)

# City of Austin Health and Human Services
## Social Service Contracts
## Client Eligibility Requirements

- U.S. Postal Service website (verification of County only) (www.usps.com)

## *INCOME*

- Client intake form must reflect wages/income of all family members 18 years old or older living in the household
- Determination of Family Size:
  - For the purposes of determining eligibility for City-funded services, a family unit consists of:
    - A person living alone:
      - An adult living alone
      - A minor child living alone or with others who are not responsible for the child's support
    - Two or more persons living together who are wholly or partially responsible for the support of the other person/people:
      - Two persons in a domestic partnership, or legal or common-law marriage
      - One or both legal parents and minor children
      - One or both adult caretakers of minors and the caretaker(s)'s minor children. Note: a caretaker is one or both adults(s) who performs parental functions (provision of food, clothing, shelter, and supervision) for a minor.
- Family income must be 200% or less of current Federal Poverty Income Guidelines (FPIG) to be eligible for City-funded services; agency must update its FPIG categories when Federal figures change. Income inclusions and exclusions are based on Texas Administrative Code §5.19 and are as follows:
  - **(1) Included Income:**
    - (A) Temporary Assistance for Needy Families (TANF);
    - (B) Money, wages and salaries before any deductions;
    - (C) Net receipts from non-farm or farm self-employment (receipts from a person's own business or from an owned or rented farm after deductions for business or farm expenses);
    - (D) Regular payments from social security, including Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI);
    - (E) Railroad retirement;
    - (F) Unemployment compensation;
    - (G) Strike benefits from union funds;
    - (H) Worker's compensation;
    - (I) Training stipends;
    - (J) Alimony;
    - (K) Military family allotments;
    - (L) Private pensions;
    - (M) Government employee pensions (including military retirement pay);
    - (N) Regular insurance or annuity payments; and
    - (O) Dividends, interest, net rental income, net royalties, periodic receipts from estates or trusts; and net gambling or lottery winnings.

  - **(2) Excluded Income:**
    - (A) Capital gains; any assets drawn down as withdrawals from a bank;
    - (B) The sale of property, a house, or a car;
    - (C) One-time payments from a welfare agency to a family or person who is in temporary financial difficulty;

# City of Austin Health and Human Services
## Social Service Contracts
## Client Eligibility Requirements

    (D) Tax refunds, gifts, loans, and lump-sum inheritances;

    (E) One-time insurance payments or compensation for injury;

    (F) Non-cash benefits, such as the employer-paid or union-paid portion of health insurance or other employee fringe benefits;

    (G) Food or housing received in lieu of wages;

    (H) The value of food and fuel produced and consumed on farms;

    (I) The imputed value of rent from owner-occupied non-farm or farm housing;

    (J) Federal non-cash benefit programs as Medicare, Medicaid, Food Stamps, and school lunches;

    (K) Housing assistance and combat zone pay to the military;

    (L) Veterans (VA) Disability Payments;

    (M) College scholarships, Pell and other grant sources, assistantships, fellowships and work study, VA Education Benefits (GI Bill); and

    (N) Child support payments.

➤ Client income amounts must reflect *Gross Income*, before any deductions

➤ If any adult family member has no income, a Self-Declaration of No Income form is required for that individual

➤ Income documentation requirement:

    ❖ Programs providing financial assistance to or on behalf of clients (including but not limited to rent, utilities, arrears, child care, tuition, occupational training): the client file must include primary eligibility sources; declaration of eligibility for another program (e.g., TANF, Free/Reduced/School Lunch Program) is not adequate documentation of eligibility

    ❖ Programs which do not provide financial assistance to or on behalf of clients: the client file must include primary eligibility sources or a self-declaration of income form

**Any question about eligibility criteria not addressed here or for which the contractor needs clarification must be referred to the contractor's City contract manager. The City has final authority to declare an individual eligible or not eligible for City-funded services based on the criteria in this document.**

# Program Budget and Narrative

| | City Funds | Other Funds | Total |
|---|---|---|---|
| **Personnel** | | | |
| Salaries | $80,000.00 | $0.00 | $80,000.00 |
| Fringe and Payroll Taxes | $0.00 | $0.00 | $0.00 |
| | **$80,000.00** | **$0.00** | **$80,000.00** |
| | | | |
| **Operations** | | | |
| General Operations | $20,000.00 | $0.00 | $20,000.00 |
| Outsourced Professional Services | $0.00 | $0.00 | $0.00 |
| Supplemental Programmatic Services | $0.00 | $0.00 | $0.00 |
| Training/Travel Outside Austin and/or Travis County | $0.00 | $0.00 | $0.00 |
| | **$20,000.00** | **$0.00** | **$20,000.00** |
| | | | |
| **Assistance to Clients** | | | |
| Rental/Mortgage Assistance | $0.00 | $0.00 | $0.00 |
| General Housing Assistance | $0.00 | $0.00 | $0.00 |
| Direct Client Assistance | $100,000.00 | $0.00 | $100,000.00 |
| Client Food and Beverage | $0.00 | $0.00 | $0.00 |
| | **$100,000.00** | **$0.00** | **$100,000.00** |
| | | | |
| **Capital Outlay** | | | |
| Capital Outlay - $5,000.00 | $0.00 | $0.00 | $0.00 |
| | **$0.00** | **$0.00** | **$0.00** |
| | | | |
| **Deliverables Amount** | | | |
| Deliverables Amount | $0.00 | $0.00 | $0.00 |
| | **$0.00** | **$0.00** | **$0.00** |
| | | | |
| **Subgrantees/Subrecipients** | | | |
| Personnel-Sub | $0.00 | $0.00 | $0.00 |
| Operations-Sub | $0.00 | $0.00 | $0.00 |
| Direct Client Assistance-Sub | $0.00 | $0.00 | $0.00 |
| Other-Sub | $0.00 | $0.00 | $0.00 |
| | **$0.00** | **$0.00** | **$0.00** |
| | | | |
| **Program Income** | | | |
| Program Income (Zero dollars budgeted for monthly credit) | $0.00 | $0.00 | $0.00 |
| | **$0.00** | **$0.00** | **$0.00** |
| | | | |
| **Other** | | | |
| Other | $0.00 | $0.00 | $0.00 |
| | **$0.00** | **$0.00** | **$0.00** |
| | | | |
| **Total** | **$200,000.00** | **$0.00** | **$200,000.00** |

# Program Budget and Narrative

Personnel

Total cost of salaries for this program including fringe and payroll taxes.

Operations

This is the cost of all consumable classroom materials used during training.

Assistance to Clients

The cost of laptops, scrubs, and the price the of the student natinal certification exam and exam preparation materials.

Capital Outlay

Deliverables Amount

Program Subgrantees

Program Income

Other



# City of Austin

# <u>Social Services Compensation Terms</u>

1.  The Grantee shall expend City funds according to the approved budget categories described in Exhibit B.1, Program Budget and Narrative, or Exhibit A.1, Program Work Statement (Deliverables), as applicable.

2.  <u>**Request for Payment**</u>

    Payment to the Grantee shall be due 30 calendar days following receipt by the City of the Grantee's fully and accurately completed payment request, using the City's contract management system. The payment request must be submitted to the City no later than 11:59 p.m. Central Standard Time 25 calendar days following the end of the month covered by the payment request. **If the 25th calendar day falls on a weekend or holiday, as outlined in Section 8.24, the deadline to submit the payment request is extended to no later than 11:59 p.m. Central Standard Time of the 1st weekday immediately following the weekend or holiday.**

3.  <u>**Documentation**</u>

    3.1. <u>FOR DELIVERABLE AGREEMENTS</u>: **Grantee must provide the City with supporting documentation as described in Exhibit A.1, Program Work Statement (Deliverables) for each monthly Payment Request where an agreement deliverable is being submitted.**

    3.2. <u>FOR REIMBURSEABLE AGREEMENTS</u>: **Grantee must provide the City with supporting documentation for each monthly payment request which includes, but is not limited to, a report of City Agreement expenditures generated from the Grantee's financial management system.**

    3.2.1. Appropriate supporting documentation includes:

    - General Ledger Detail report from the Grantee's financial management system
    - Transaction Detail by Account Report from the Grantee's financial management system
    - Other reports that meet all of the following specifications:
      - produced from the Grantee's accounting system with no manual changes or adjustments
      - submitted in PDF format
      - includes date the report was created
      - demonstrates specific expenses for which reimbursement is being requested
      - demonstrates that City of Austin funds are maintained in a separate numbered bank account or standalone general operating account that includes only City expenses and reimbursements.

4.  <u>**Right of Final Approval.**</u>

    **The City retains right of final approval of any supporting documentation submitted before a payment request is approved for processing. Failure to provide supporting documentation acceptable to the City may result in delay or rejection of the payment request. The City reserves the right to modify the required supporting documentation, as needed.**

4.1    Unless otherwise expressly authorized in the Agreement, the Grantee shall pass through all Subagreement and other authorized expenses at actual cost without markup.

4.2    Federal excise taxes, state taxes, or City sales taxes must not be included in the invoiced amount.  The City will furnish a tax exemption certificate upon request.

## 5.    Payment.

5.1    All requests accepted and approved for payment by the City will be paid within 30 calendar days of the City's receipt of the deliverables or of the invoice, whichever is later. Requests for payment received without the information required in Section 3 cannot be processed, will be returned to the Grantee, and City will make no payment in connection with such request.

5.2    If payment is not timely made, (per this paragraph), interest shall accrue on the unpaid balance at the lesser of the rate specified in Texas Government Code Section 2251.025 or the maximum lawful rate; except, if payment is not timely made for a reason for which the City may withhold payment hereunder, interest shall not accrue until 10 calendar days after the grounds for withholding payment have been resolved.

5.3    The City may withhold or set off the entire payment or part of any payment otherwise due the Grantee to such extent as may be necessary on account of;

5.3.1   delivery of unsatisfactory services by the Grantee;

5.3.2   third party claims, which are not covered by the insurance which the Grantee is required to provide, are filed or reasonable evidence indicating probable filing of such claims;

5.3.3   failure of the Grantee to pay Subgrantees, or for labor, materials or equipment,

5.3.4   damage to the property of the City or the City's agents, employees or Grantees, which is not covered by insurance required to be provided by the Grantee;

5.3.5   reasonable evidence that the Grantee's obligations will not be completed within the time specified in the Agreement, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay;

5.3.6   failure of the Grantee to submit proper payment requests with all required attachments and supporting documentation;

5.3.7   failure of the Grantee to comply with any material provision of the Agreement; or

5.3.8   identification of previously reimbursed expenses determined to be unallowable after payment was made.

5.4   Notice is hereby given of Article VIII, Section 1 of the Austin City Charter which prohibits the payment of any money to any person, firm or corporation who is in arrears to the City for taxes, and of §2-8-3 of the Austin City Code concerning the right of the City to offset indebtedness owed the City.  Payment will be made by check unless the parties mutually agree to payment by electronic transfer of funds.

6.    **Non-Appropriation.**  The awarding or continuation of this Agreement is dependent upon the availability of funding and authorization by Council.  The City's payment obligations are payable only and solely from funds appropriated and available for this Agreement.  The absence of appropriated or other lawfully available funds shall render the Agreement null and void to the extent funds are not appropriated or available and any deliverables delivered but unpaid shall be returned to the Grantee. The City shall provide the Grantee written notice of the failure of the City to make an adequate appropriation for any fiscal year to pay the amounts due under the Agreement, or the reduction of any appropriation to an amount insufficient to permit the City to pay its obligations under the Agreement.  In the event of non- or inadequate appropriation of funds, there will be no penalty or removal fees charged to the City.

7. **Travel Expenses** All approved travel, lodging, and per diem expenses in connection with the Agreement for which reimbursement may be claimed by the Grantee under the terms of the Agreement will be reviewed against the City's Travel Policy and the current United States General Services Administration Domestic Per Diem Rates (Rates) as published and maintained on the Internet at:

http://www.gsa.gov/portal/category/21287

No amounts in excess of the Travel Policy or Rates shall be paid. No reimbursement will be made for expenses not actually incurred. Airline fares other than coach or economy will not be reimbursed. Mileage charges may not exceed the amount permitted as a deduction in any year under the Internal Revenue Code or Regulation.

8. **Final Payment and Close-Out**

8.2 The making and acceptance of final payment will constitute:

8.2.1 a waiver of all claims by the City against the Grantee, except claims (1) which have been previously asserted in writing and not yet settled, (2) arising from defective work appearing after final inspection, (3) arising from failure of the Grantee to comply with the Agreement or the terms of any warranty specified herein, regardless of when the cause for a claim is discovered (4) arising from the Grantee's continuing obligations under the Agreement, including but not limited to indemnity and warranty obligations, or (5) arising under the City's right to audit; and

8.2.2 a waiver of all claims by the Grantee against the City other than those previously asserted in writing and not yet settled.

9. **Financial Terms**

9.2 The City agrees to pay Grantee for services rendered under this Agreement and to reimburse Grantee for actual, eligible expenses incurred and paid in accordance with all terms and conditions of this Agreement. The City shall not be liable to Grantee for any costs incurred by Grantee which are not reimbursable as set forth in Section 10 of this Exhibit.

9.3 The City's obligation to pay is subject to the timely receipt of complete and accurate reports as set forth in Section 3 of the Agreement, and any other deliverable required under this Agreement.

9.4 Payments to the Grantee will immediately be suspended upon the occasion of any late, incomplete, or inaccurate report, audit, or other required report or deliverable under this Agreement, and payments will not be resumed until the Grantee is in full compliance.

9.5 The City shall not be liable to Grantee for any costs which have been paid under other agreements or from other funds. In addition, the City shall not be liable for any costs incurred by Grantee which were: a) incurred prior to the effective date of this Agreement or outside the Agreement period as referenced in Section 2.1, or b) not billed to the City within 5 business days before the due date for the Grantee's annual Contract Progress Report or Contract Closeout Summary Report, whichever is applicable.

9.6 Grantee agrees to refund to the City any funds paid under this Agreement which the City determines have resulted in overpayment to Grantee or which the City determines have not been spent by Grantee in accordance with the terms of this Agreement. Refunds shall be made by Grantee within 30 calendar days after a written refund request is submitted by the City. The City may, at its discretion, offset refunds due from any payment due Grantee, and the City may also deduct any loss, cost, or expense caused by Grantee from funds otherwise due.

9.7 Grantee shall deposit and maintain all funds received under this Agreement in either a separate numbered bank account or a general operating account, either of which shall be supported with

the maintenance of a separate accounting with a specific chart which reflects specific revenues and expenditures for the monies received under this Agreement. The Grantee's accounting system must identify the specific expenditures, or portions of expenditures, against which funds under this Agreement are disbursed. Grantee must be able to produce an accounting system-generated report of exact expenses or portions of expenses charged to the City for any given time period.

9.8 Grantee is required to utilize an online Agreement management system for billing and reporting in accordance with the City's guidelines, policies, and procedures. Grantee is responsible for all data entered/edited under its unique username, as well as all required but omitted data.

9.9 Grantee shall expend the City budget in a reasonable manner in relation to Agreement time elapsed and/or Agreement program service delivery schedule. If cumulative expenditures are not within acceptable amounts, the City may require the Grantee to: 1) submit an expenditure plan, and/or 2) amend the Agreement budget amount to reflect projected expenditures, as determined by the City.

## 10. Allowable and Unallowable Costs

The City shall make the final determination of whether a cost is allowable or unallowable under this Agreement.

10.1 Reimbursement Only. Expenses and/or expenditures shall be considered reimbursable only if incurred during the current Program Period identified in the attached Program Exhibits, directly and specifically in the performance of this Agreement, and in conformance with the Agreement Exhibits. Grantee agrees that, unless otherwise specifically provided for in this Agreement, payment by the City under the terms of this Agreement is made on a reimbursement basis only; Grantee must have incurred and paid costs prior to those costs being invoiced and considered allowable under this Agreement and subject to payment by the City. Expenses incurred during the Program Period may be paid up to 30 days after the end of the Program Period and included in the Final Payment Request for the Program Period, which shall be due no later than 11:59 p.m. CST 5 calendar days before the due date for the Grantee's annual Contract Progress Report or Contract Closeout Summary Report, whichever is applicable.

10.1.1 To be allowable under this Agreement, a cost must meet all of the following general criteria:

- Be reasonable for the performance of the activity under the Agreement
- Conform to any limitations or exclusions set forth in this Agreement
- Be consistent with policies and procedures that apply uniformly to both government- financed and other activities of the organization
- Be determined and accounted in accordance with generally accepted accounting principles (GAAP)
- Be adequately documented

10.2 The City's prior written authorization is required in order for the following to be considered allowable costs. Inclusion in the budget within this Agreement constitutes "written authorization." The item shall be specifically identified in the budget. The City shall have the authority to make the final determination as to whether an expense is an allowable cost.

1. Alteration, construction, or relocation of facilities;
2. Cash payments, including cash equivalent gift cards such as Visa, MasterCard, and American Express;
3. Equipment and other capital expenditures;

4. Interest, other than mortgage interest as part of a pre-approved budget under this Agreement;
5. Organization costs (costs in connection with the establishment or reorganization of an organization);
6. Purchases of tangible, nonexpendable property, including fax machines, stereo systems, cameras, video recorder/players, microcomputers, software, printers, microscopes, oscilloscopes, centrifuges, balances and incubator, or any other item having a useful life of more than one year and an acquisition cost, including freight, of over $5,000;
7. Selling and marketing; or
8. Travel/training outside Travis County.

10.3 The following types of expenses are specifically **not allowable** with City funds under this Agreement. The City shall have the authority to make the final determination as to whether an expense is an allowable cost.

1. Alcoholic beverages;
2. Bad debts;
3. Compensation of trustees, directors, officers, or advisory board members, other than those acting in an executive capacity;
4. Contingency provisions (funds) *(Self-insurance reserves and pension funds are allowable);*
5. Defense and prosecution of criminal and civil proceedings, claims, appeals, and patent infringement;
6. Deferred costs;
7. Depreciation;
8. Donations and contributions, including donated goods or space;
9. Entertainment costs, other than expenses related to client incentives;
10. Fines and penalties (including late fees);
11. Fundraising and development costs;
12. Goods or services for officers' or employees' personal use;
13. Housing and personal living expenses for organization's officers or employees;
14. Idle facilities and idle capacity;
15. Litigation-related expenses (including personnel costs) in action(s) naming the City as a Defendant;
16. Lobbying or other expenses related to political activity;
17. Losses on other agreements or casualty losses;
18. Public relations costs, except reasonable, pre-approved advertising costs related directly to services provided under this Agreement;
19. Taxes, other than payroll and other personnel-related levies; or
20. Travel outside of the United States of America.

## 11.   Ownership of Property.

11.1   Ownership title to all capital acquisition, supplies, materials or any other property purchased with funds received under this Agreement and in accordance with the provisions of the Agreement, purchased with City funds shall convey to the Grantee 2 years after purchase, unless notified by the City in writing.

11.1.1 If the services funded by this Agreement are provided in a facility owned by the City or leased from the Travis County, , ownership title to all capital acquisition, supplies, materials or any other property purchased with funds received under this Agreement shall remain with the City.

11.2    Written notification must be given to the City within 5 calendar days of delivery of nonexpendable property (defined as anything that has a life or utility of more than 1 year and an acquisition cost, including freight, of over $5,000) in order for the City to effect identification and recording for inventory purposes.  Grantee shall maintain adequate accountability and control over such property, maintain adequate property records, perform an annual physical inventory of all such property, and report this information in the Annual Agreement Progress Report, due as indicated in Section 4.2.3 of the Agreement, as well as in the Agreement Closeout Summary Report, as indicated in Section 4.2.4 of the Agreement.

11.3    In the event Grantee's services are retained under a subsequent agreement, and should Grantee satisfactorily perform its obligations under this Agreement, Grantee shall be able to retain possession of non-expendable property purchased under this Agreement for the duration of the subsequent agreement.

**City of Austin, Texas**
**Human Rights Commission**

To: City of Austin, Texas, ("OWNER")

I hereby certify that our firm conforms to the Code of the City of Austin, Section 5-4-2 as reiterated below:

Chapter 5-4. Discrimination in Employment by City Contractors.

**Sec. 4-2 Discriminatory Employment Practices Prohibited.** As an Equal Employment Opportunity (EEO) employer, the Contractor will conduct its personnel activities in accordance with established federal, state and local EEO laws and regulations and agrees:

(B)  (1)  Not to engage in any discriminatory employment practice defined in this chapter.

(2)  To take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without discrimination being practiced against them as defined in this chapter. Such affirmative action shall include, but not be limited to: all aspects of employment, including hiring, placement, upgrading, transfer, demotion, recruitment, recruitment advertising; selection for training and apprenticeship, rates of pay or other form of compensation, and layoff or termination.

(3)  To post in conspicuous places, available to employees and applicants for employment, notices to be provided by OWNER setting forth the provisions of this chapter.

(4)  To state in all solicitations or advertisements for employees placed by or on behalf of the Contractor, that all qualified applicants will receive consideration for employment without regard to race, creed, color, religion, national origin, sexual orientation, gender identity, disability, veteran status, sex or age.

(5)  To obtain a written statement from any labor union or labor organization furnishing labor or service to Contractors in which said union or organization has agreed not to engage in any discriminatory employment practices as defined in this chapter and to take affirmative action to implement policies and provisions of this chapter.

(6)  To cooperate fully with OWNER's Human Rights Commission in connection with any investigation or conciliation effort of said Human Rights Commission to ensure that the purpose of the provisions against discriminatory employment practices are being carried out.

(7)  To require compliance with provisions of this chapter by all subcontractors having fifteen or more employees who hold any subcontract providing for the expenditure of $2,000 or more in connection with any contract with OWNER subject to the terms of this chapter.

For the purposes of this Offer and any resulting Contract, Contractor adopts the provisions of the City's Minimum Standard Nondiscrimination Policy set forth below.

**City of Austin**
**Minimum Standard Non-Discrimination in Employment Policy:**

*As an Equal Employment Opportunity (EEO) employer, the Contractor will conduct its personnel activities in accordance with established federal, state and local EEO laws and regulations.*

*The Contractor will not discriminate against any applicant or employee based on race, creed, color, national origin, sex, age, religion, veteran status, gender identity, disability, or sexual orientation. This policy covers all aspects of employment, including hiring, placement, upgrading, transfer,*

demotion, recruitment, recruitment advertising, selection for training and apprenticeship, rates of pay or other forms of compensation, and layoff or termination.

Further, employees who experience discrimination, sexual harassment, or another form of harassment should immediately report it to their supervisor. If this is not a suitable avenue for addressing their complaint, employees are advised to contact another member of management or their human resources representative. No employee shall be discriminated against, harassed, intimidated, nor suffer any reprisal as a result of reporting a violation of this policy. Furthermore, any employee, supervisor, or manager who becomes aware of any such discrimination or harassment should immediately report it to executive management or the human resources office to ensure that such conduct does not continue.

Contractor agrees that to the extent of any inconsistency, omission, or conflict with its current non-discrimination employment policy, the Contractor has expressly adopted the provisions of the City's Minimum Non-Discrimination Policy contained in Section 5-4-2 of the City Code and set forth above, as the Contractor's Non-Discrimination Policy or as an amendment to such Policy and such provisions are intended to not only supplement the Contractor's policy, but will also supersede the Contractor's policy to the extent of any conflict.

UPON CONTRACT AWARD, THE CONTRACTOR SHALL PROVIDE A COPY TO THE CITY OF THE CONTRACTOR'S NON-DISCRIMINATION POLICY ON COMPANY LETTERHEAD, WHICH CONFORMS IN FORM, SCOPE, AND CONTENT TO THE CITY'S MINIMUM NON-DISCRIMINATION POLICY, AS SET FORTH HEREIN, OR THIS NON-DISCRIMINATION POLICY, WHICH HAS BEEN ADOPTED BY THE CONTRACTOR FOR ALL PURPOSES (THE FORM OF WHICH HAS BEEN APPROVED BY THE CITY'S EQUAL EMPLOYMENT/FAIR HOUSING OFFICE), WILL BE CONSIDERED THE CONTRACTOR'S NON-DISCRIMINATION POLICY WITHOUT THE REQUIREMENT OF A SEPARATE SUBMITTAL.

**Sanctions:**
Our firm understands that non-compliance with Chapter 5-4 may result in sanctions, including termination of the contract and suspension or debarment from participation in future City contracts until deemed compliant with the requirements of Chapter 5-4.

**Term:**
The Contractor agrees that this Section 0800 Non-Discrimination Certificate or the Contractor's separate conforming policy, which the Contractor has executed and filed with the Owner, will remain in force and effect for one year from the date of filing. The Contractor further agrees that, in consideration of the receipt of continued Contract payments, the Contractor's Non-Discrimination Policy will automatically renew from year-to-year for the term of the underlying Contract.

Dated this __September__ day of __10__, __2020__

CONTRACTOR
Authorized
Signature

Title

*Todd Hamilton*

*Thamilton*

*Campus President*

## PROHIBITION OF BOYCOTT OF ISRAEL VERIFICATION

Pursuant to Texas Government Code §2271.002, the City is prohibited from contracting with any "company" for goods or services unless the following verification is included in this Contract:

A.  For the purposes of this Section only, the terms "company" and "boycott Israel" have the meaning assigned by Texas Government Code §2271.001.

B.  If the Grantee qualifies as a "company", then the Principal Artist verifies that he:
    i.   does not "boycott Israel"; and
    ii.  will not "boycott Israel" during the term of this Contract.

C.  The Grantee's obligations under this Section, if any exist, will automatically cease or be reduced to the extent that the requirements of Texas Government Code Chapter 2271 are subsequently repealed, reduced, or declared unenforceable or invalid in whole or in part by any court or tribunal of competent jurisdiction or by the Texas Attorney General, without any further impact on the validity or continuity of this Contract.

A COURT OF COMPETENT JURISDICTION HAS RECENTLY ENJOINED THE ABOVE STATE LAW. HOWEVER, IF THIS INJUNCTION IS LIFTED OR STAYED BY A COURT OR OTHER ENTITY OF COMPETENT JURISDICTION, THIS SECTION WILL BE AN ENFORCEABLE AND REQUIRED TERM OF YOUR CONTRACT WITH THE CITY. IF YOU DISAGREE WITH THE ABOVE SECTION OF THE CONTRACT, PLEASE STRIKE THROUGH IT OR INDICATE YOUR OBJECTION IN THE EXCEPTIONS SECTION. YOUR CONTRACT WILL NOT BE AFFECTED BY STRIKING THROUGH THIS PROVISION, AT THIS TIME.

## INTERESTED PARTIES DISCLOSURE (FORM 1295)

As a condition to entering the Contract, the Business Entity constituting the Grantee must provide the following disclosure of Interested Parties to the City prior to the award of a contract with the City on Form 1295 "Certificate of Interested Parties" as prescribed by the Texas Ethics Commission for any contract award requiring City Council authorization. The Certificate of Interested Parties Form must be completed on the Texas Ethics Commission website, printed, and signed by the authorized agent of the Business Entity with acknowledgment that disclosure is made under oath and under penalty of perjury. The City will verify the "Certificate of Interested Parties" with the Texas Ethics Commission prior to execution of the Agreement. The Grantee is reminded that the provisions of Local Government Code 176, regarding conflicts of interest between the bidders and local officials remains in place. Link to Texas Ethics Commission Form 1295 process and procedures below:

https://www.ethics.state.tx.us/whatsnew/elf_info_form1295.htm

## CHAPTER 176 CONFLICT OF INTEREST DISCLOSURE

In accordance with Chapter 176 of the Texas Local Government Code, Grantee must file a Conflict of Interest Questionnaire (Questionnaire) with the Office of the City Clerk no later than 5:00 P.M. on the seventh (7th) business day after the commencement of contract discussions or negotiations with the City or the submission of an Offer, or other writing related to a potential Contract with the City, and update the questionnaire not later than seven (7) business days after becoming aware of an event that would make a statement in the questionnaire incomplete or inaccurate. Grantee has a continuing obligation to file the Questionnaire in accordance with the requirements of Chapter 176 of the Texas Local Government Code once it becomes aware of a need to do so. The Questionnaire is available on line at the following website for the City Clerk:

http://www.austintexas.gov/department/conflict-interest-questionnaire

There are statutory penalties for failure to comply with Chapter 176.

# BUSINESS ASSOCIATE AGREEMENT PROVISIONS

This Business Associate Agreement (the "Agreement"), is made by and between the Grantee (Business Associate) and the City (Covered Entity) (collectively the "Parties") to comply with privacy standards adopted by the U.S. Department of Health and Human Services as they may be amended from time to time, 45 C.F.R. parts 160 and 164 ("the Privacy Rule") and security standards adopted by the U.S. Department of Health and Human Services as they may be amended from time to time, 45 C.F.R. parts 160, 162 and 164, subpart C ("the Security Rule"), and the Health Information Technology for Economic and Clinical Health (HITECH) Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009 and regulations promulgated there under and any applicable state confidentiality laws.

## RECITALS

WHEREAS, Business Associate provides services outlined in Exhibit A.1 to or on behalf of Covered Entity;

WHEREAS, in connection with these services, Covered Entity discloses to Business Associate certain protected health information that is subject to protection under the HIPAA Rules; and

WHEREAS, the HIPAA Rules require that Covered Entity receive adequate assurances that Business Associate will comply with certain obligations with respect to the PHI received, maintained, or transmitted in the course of providing services to or on behalf of Covered Entity.

NOW THEREFORE, in consideration of the mutual promises and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

A.    Definitions. Terms used herein, but not otherwise defined, shall have meaning ascribed by the Privacy Rule and the Security Rule.

    1.    Breach. "Breach" shall have the same meaning as the term "breach" in 45 C.F.R. §164.502.

    2.    Business Associate. "Business Associate" shall have the same meaning as the term "business associate" in 45 C.F.R. §160.103 and in reference to the party to this agreement, shall mean Grantee.

    3.    Covered Entity. "Covered Entity" shall have the same meaning as the term "covered entity" in 45 C.F.R. §160.103 and in reference to the party to this agreement shall mean The City of Austin.

    4.    Designated Record Set. "Designated Record Set" shall mean a group of records maintained by or for a Covered Entity that is: (i) the medical records and billing records about Individuals maintained by or for a covered health care provider; (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or

(iii) used, in whole or in part, by or for the covered entity to make decisions about Individuals. For purposes of this definition, the term "record" means any item, collection, or grouping of information that includes protected health information and is maintained, collected, used, or disseminated by or for a covered entity.

5.  HIPAA Rules. The Privacy Rule and the Security Rule and amendments codified and promulgated by the HITECH Act are referred to collectively herein as "HIPAA Rules."

6.  Individual. "Individual" shall mean the person who is the subject of the protected health information.

7.  Incident. "Incident" means a potential or attempted unauthorized access, use, disclosure, modification, loss or destruction of PHI, which has the potential for jeopardizing the confidentiality, integrity or availability of the PHI.

8.  Protected Health Information ("PHI"). "Protected Health Information" or PHI shall have the same meaning as the term "protected health information" in 45 C.F.R. §160.103, limited to the information created, received, maintained or transmitted by Business Associate from or on behalf of covered entity pursuant to this Agreement.

9.  Required by Law. "Required by Law" shall mean a mandate contained in law that compels a use or disclosure of PHI.

10. Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his or her Designee.

11. Sensitive Personal Information. "Sensitive Personal Information" shall mean an individual's first name or first initial and last name in combination with any one or more of the following items, if the name and the items are not encrypted:    a)    social security number; driver's license number or government-issued identification number; or account number or credit or debit card number in combination with any required security code, access code, or password that would permit access to an individual's financial account; or b) information that identifies an individual and relates to: the physical or mental health or condition of the individual; the provision of health care to the individual; or payment for the provision of health care to the individual.

12. Subcontractor. "subcontractor" shall have the same meaning as the term "subcontractor" in 45 C.F.R. §160.103.

13. Unsecured PHI. "Unsecured PHI" shall mean PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary in the guidance issued under section 13402(h)(2) of Public Law 111-5.

B.  **Purposes for which PHI May Be Disclosed to Business Associate**. In connection with the services provided by Business Associate to or on behalf of Covered Entity described in this Agreement, Covered Entity may disclose PHI to Business Associate for the purposes of providing a social service.

C.  **Obligations of Covered Entity**. If deemed applicable by Covered Entity, Covered Entity shall:

1.  provide Business Associate a copy of its Notice of Privacy Practices ("Notice") produced by Covered Entity in accordance with 45 C.F.R. 164.520 as well as any changes to such Notice;

2.  provide Business Associate with any changes in, or revocation of, authorizations by Individuals relating to the use and/or disclosure of PHI, if such changes affect Business Associate's permitted or required uses and/or disclosures;

3.  notify Business Associate of any restriction to the use and/or disclosure of PHI to which Covered Entity has agreed in accordance with 45 C.F.R. 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI;

4.  not request Business Associate to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by the Covered entity;

5.  notify Business Associate of any amendment to PHI to which Covered Entity has agreed that affects a Designated Record Set maintained by Business Associate;

6.  if Business Associate maintains a Designated Record Set, provide Business Associate with a copy of its policies and procedures related to an Individual's right to: access PHI; request an amendment to PHI; request confidential communications of PHI; or request an accounting of disclosures of PHI; and,

7.  direct, review and control notification made by the Business Associate of individuals of breach of their Unsecured PHI in accordance with the requirements set forth in 45 C.F.R. §164.404.

D.  **Obligations of Business Associate**. Business Associate agrees to comply with applicable federal and state confidentiality and security laws, specifically the provisions of the HIPAA Rules applicable to business associates, including:

1.  **Use and Disclosure of PHI**. Except as otherwise permitted by this Agreement or applicable law, Business Associate shall not use or disclose PHI except as necessary to provide Services described above to or on behalf of Covered Entity, and shall not use or disclose PHI that would violate the HIPAA Rules if used or disclosed by Covered Entity. Also, knowing that there are certain restrictions on disclosure of PHI. Provided, however, Business Associate may use and disclose PHI as necessary for the proper management and

administration of Business Associate, or to carry out its legal responsibilities. Business Associate shall in such cases:

(a) provide information and training to members of its workforce using or disclosing PHI regarding the confidentiality requirements of the HIPAA Rules and this Agreement;

(b) obtain reasonable assurances from the person or entity to whom the PHI is disclosed that: (a) the PHI will be held confidential and further used and disclosed only as Required by Law or for the purpose for which it was disclosed to the person or entity; and (b) the person or entity will notify Business Associate of any instances of which it is aware in which confidentiality of the PHI has been breached; and

(c) agree to notify the designated Privacy Officer of Covered Entity of any instances of which it is aware in which the PHI is used or disclosed for a purpose that is not otherwise provided for in this Agreement or for a purpose not expressly permitted by the HIPAA Rules.

2. Data Aggregation. In the event that Business Associate works for more than one Covered Entity, Business Associate is permitted to use and disclose PHI for data aggregation purposes, however, only in order to analyze data for permitted health care operations, and only to the extent that such use is permitted under the HIPAA Rules.

3. De-identified Information. Business Associate may use and disclose de-identified health information if written approval from the Covered Entity is obtained, and the PHI is de-identified in compliance with the HIPAA Rules. Moreover, Business Associate shall review and comply with the requirements defined under Section E. of this Agreement.

4. Safeguards.

(a) Business Associate shall maintain appropriate safeguards to ensure that PHI is not used or disclosed other than as provided by this Agreement or as Required by Law. Business Associate shall implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any paper or electronic PHI it creates, receives, maintains, or transmits on behalf of Covered Entity.

(b) Business Associate shall assure that all PHI be secured when accessed by Business Associate's employees, agents or subcontractor. Any access to PHI by Business Associate's employees, agents or subcontractors shall be limited to legitimate business needs while working with PHI. Any personnel changes by Business Associate, eliminating the legitimate business needs for employees, agents or contractors access to PHI – either by revision of duties or termination – shall be immediately reported to Covered

Entity. Such reporting shall be made no later than the third business day after the personnel change becomes effective.

5.  Minimum Necessary. Business Associate shall ensure that all uses and disclosures of PHI are subject to the principle of "minimum necessary use and disclosure," i.e., that only PHI that is the minimum necessary to accomplish the intended purpose of the use, disclosure, or request is used or disclosed; and, the use of limited data sets when possible.

6.  Disclosure to Agents and Subcontractors. If Business Associate discloses PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, to agents, including a subcontractor, Business Associate shall require the agent or subcontractor to agree to the same restrictions and conditions as apply to Business Associate under this Agreement. Business Associate shall ensure that any agent, including a subcontractor, agrees to implement reasonable and appropriate safeguards to protect the confidentiality, integrity, and availability of the paper or electronic PHI that it creates, receives, maintains, or transmits on behalf of the Covered Entity. Business Associate shall be liable to Covered Entity for any acts, failures or omissions of the agent or subcontractor in providing the services as if they were Business Associate's own acts, failures or omissions, to the extent permitted by law. Business Associate further expressly warrants that its agents or subcontractors will be specifically advised of, and will comply in all respects with, the terms of this Agreement.

7.  Individual Rights Regarding Designated Record Sets. If Business Associate maintains a Designated Record Set on behalf of Covered Entity Business Associate agrees as follows:

    (a)  Individual Right to Copy or Inspection. Business Associate agrees that if it maintains a Designated Record Set for Covered Entity that is not maintained by Covered Entity, it will permit an Individual to inspect or copy PHI about the Individual in that set as directed by Covered Entity to meet the requirements of 45 C.F.R. § 164.524. If the PHI is in electronic format, the Individual shall have a right to obtain a copy of such information in electronic format and, if the Individual chooses, to direct that an electronic copy be transmitted directly to an entity or person designated by the individual in accordance with HITECH section 13405 (c). Under the Privacy Rule, Covered Entity is required to take action on such requests as soon as possible, but not later than 30 days following receipt of the request. Business Associate agrees to make reasonable efforts to assist Covered Entity in meeting this deadline. The information shall be provided in the form or format requested if it is readily producible in such form or format; or in summary, if the Individual has agreed in advance to accept the information in summary form. A reasonable, cost-based fee for copying health information may be charged. If Covered Entity maintains the requested records, Covered Entity, rather than Business

Associate shall permit access according to its policies and procedures implementing the Privacy Rule.

(b) Individual Right to Amendment. Business Associate agrees, if it maintains PHI in a Designated Record Set, to make amendments to PHI at the request and direction of Covered Entity pursuant to 45 C.F.R. §164.526. If Business Associate maintains a record in a Designated Record Set that is not also maintained by Covered Entity, Business Associate agrees that it will accommodate an Individual's request to amend PHI only in conjunction with a determination by Covered Entity that the amendment is appropriate according to 45 C.F.R. §164.526.

(c) Accounting of Disclosures. Business Associate agrees to maintain documentation of the information required to provide an accounting of disclosures of PHI, whether PHI is paper or electronic format, in accordance with 45 C.F.R. §164.528 and HITECH Sub Title D Title VI Section 13405 (c), and to make this information available to Covered Entity upon Covered Entity's request, in order to allow Covered Entity to respond to an Individual's request for accounting of disclosures. Under the Privacy Rule, Covered Entity is required to take action on such requests as soon as possible but not later than 60 days following receipt of the request. Business Associate agrees to use its best efforts to assist Covered Entity in meeting this deadline but not later than 45 days following receipt of the request. Such accounting must be provided without cost to the individual or Covered Entity if it is the first accounting requested by an individual within any 12-month period; however, a reasonable, cost-based fee may be charged for subsequent accountings if Business Associate informs the individual in advance of the fee and is afforded an opportunity to withdraw or modify the request. Such accounting is limited to disclosures that were made in the six (6) years prior to the request (not including disclosures prior to the compliance date of the Privacy Rule) and shall be provided for as long as Business Associate maintains the PHI.

8. Internal Practices, Policies and Procedures. Except as otherwise specified herein, Business Associate shall make available its internal practices, books, records, policies and procedures relating to the use and disclosure of PHI, received from or on behalf of Covered Entity to the Secretary or his or her agents for the purpose of determining Covered Entity's compliance with the HIPAA Rules, or any other health oversight agency, or to Covered Entity. Records requested that are not protected by an applicable legal privilege will be made available in the time and manner specified by Covered Entity or the Secretary.

9. Notice of Privacy Practices. Business Associate shall abide by the limitations of Covered Entity's Notice of which it has knowledge. Any use or disclosure permitted by this Agreement may be amended by changes to Covered Entity's Notice; provided, however, that the amended Notice shall not affect

permitted uses and disclosures on which Business Associate relied prior to receiving notice of such amended Notice.

10. Withdrawal of Authorization. If the use or disclosure of PHI in this Agreement is based upon an Individual's specific authorization for the use or disclosure of his or her PHI, and the Individual revokes such authorization, the effective date of such authorization has expired, or such authorization is found to be defective in any manner that renders it invalid, Business Associate shall, if it has notice of such revocation, expiration, or invalidity, cease the use and disclosure of the Individual's PHI except to the extent it has relied on such use or disclosure, or if an exception under the Privacy Rule expressly applies.

11. Knowledge of HIPAA Rules. Business Associate agrees to review and understand the HIPAA Rules as it applies to Business Associate, and to comply with the applicable requirements of the HIPAA Rule, as well as any applicable amendments.

12. Information Incident Notification for PHI. Business Associate will report any successful Incident of which it becomes aware and at the request of the Covered Entity, will identify: the date of the Incident, scope of Incident, Business Associate's response to the Incident, and the identification of the party responsible for causing the Incident.

13. Information Breach Notification for PHI. Business Associate expressly recognizes that Covered Entity has certain reporting and disclosure obligations to the Secretary and the Individual in case of a security breach of unsecured PHI. Where Business Associate accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses or discloses unsecured paper or electronic PHI, Business Associate immediately following the "discovery" (within the meaning of 45 C.F.R. §164.410(a)) of a breach of such information, shall notify Covered Entity of such breach. Initial notification of the breach does not need to be in compliance with 45 C.F.R. §164.404(c); however, Business Associate must provide Covered Entity with all information necessary for Covered Entity to comply with 45 C.F.R. §164.404(c) without reasonable delay, and in no case later than **three** days following the discovery of the breach. Business Associate shall be liable for the costs associated with such breach if caused by the Business Associate's negligent or willful acts or omissions, or the negligent or willful acts or omissions of Business Associate's agents, officers, employees or subcontractors.

14. Breach Notification to Individuals. Business Associate's duty to notify Covered Entity of any breach does not permit Business Associate to notify those individuals whose PHI has been breached by Business Associate without the express written permission of Covered Entity to do so. Any and all notification to those individuals whose PHI has been breached shall be made by the Business Associate under the direction, review and control of Covered Entity. The Business Associate will notify the Covered Entity via telephone with follow-up in writing to include; name of individuals whose PHI

was breached, information breached, date of breach, form of breach, etc. The cost of the notification will be paid by the Business Associate.

15. <u>Information Breach Notification for Other Sensitive Personal Information</u>. In addition to the reporting under Section D.12, Business Associate shall notify Covered Entity of any breach of computerized Sensitive Personal Information (as determined pursuant to Tile 11, subtitle B, chapter 521, Subchapter A, Section 521.053. Texas Business & Commerce Code) to assure Covered Entity's compliance with the notification requirements of Title 11, Subtitle B, Chapter 521, Subchapter A, Section 521.053, Texas Business & Commerce Code. Accordingly, Business Associate shall be liable for all costs associated with any breach caused by Business Associate's negligent or willful acts or omissions, or those negligent or willful acts or omissions of Business Associate's agents, officers, employees or subcontractors.

E. <u>Permitted Uses and Disclosures by Business Associates</u>. Except as otherwise limited in this Agreement, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in this Business Associates Agreement or in a Master Services Agreement, provided that such use or disclosure would not violate the HIPAA Rules if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity. Also, Business Associate may use PHI to report violations of law to appropriate Federal and State authorities, consistent with the HIPAA Rules.

1. <u>Use</u>. Business Associate will not, and will ensure that its directors, officers, employees, contractors and other agents do not, use PHI other than as permitted or required by Business Associate to perform the Services or as required by law, but in no event in any manner that would constitute a violation of the Privacy Standards or Security standards if used by Covered Entity.

2. <u>Disclosure</u>. Business Associate will not, and will ensure that its directors, officers, employees, contractors, and other agents do not, disclose PHI other than as permitted pursuant to this arrangement or as required by law, but in no event disclose PHI in any manner that would constitute a violation of the Privacy Standards or Security Standards if disclosed by Covered Entity.

3. Business Associate acknowledges and agrees that Covered Entity owns all right, title, and interest in and to all PHI, and that such right, title, and interest will be vested in Covered Entity. Neither Business Associate nor any of its employees, agents, consultants or assigns will have any rights in any of the PHI, except as expressly set forth above. Business Associate represents, warrants, and covenants that it will not compile and/or distribute analyses to third parties using any PHI without Covered Entity's express written consent.

F. <u>Application of Security and Privacy Provisions to Business Associate</u>.

1. <u>Security Measures</u>. Sections 164.308, 164.310, 164.312 and 164.316 of Title 45 of the Code of Federal Regulations dealing with the administrative, physical and technical safeguards as well as policies, procedures and documentation

requirements that apply to Covered Entity shall in the same manner apply to Business Associate. Any additional security requirements contained in Sub Title D of Title IV of the HITECH Act that apply to Covered Entity shall also apply to Business Associate. Pursuant to the foregoing requirements in this section, the Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the paper or electronic PHI that it creates, has access to, or transmits. Business Associate will also ensure that any agent, including a subcontractor, to whom it provides such information, agrees to implement reasonable and appropriate safeguards to protect such information. Business Associate will ensure that PHI contained in portable devices or removable media is encrypted.

2. <u>Annual Guidance</u>. For the first year beginning after the date of the enactment of the HITECH Act and annually thereafter, the Secretary shall annually issue guidance on the most effective and appropriate technical safeguards for use in carrying out the sections referred to in subsection (a) and the security standards in subpart C of part 164 of title 45, Code of Federal Regulations. Business Associate shall, at their own cost and effort, monitor the issuance of such guidance and comply accordingly.

3. <u>Privacy Provisions</u>. The enhanced HIPAA privacy requirements including but not necessarily limited to accounting for certain PHI disclosures for treatment, restrictions on the sale of PHI, restrictions on marketing and fundraising communications, payment and health care operations contained Subtitle D of the HITECH Act that apply to the Covered entity shall equally apply to the Business Associate.

4. <u>Application of Civil and Criminal Penalties</u>. If Business Associate violates any security or privacy provision specified in subparagraphs (1) and (2) above, sections 1176 and 1177 of the Social Security Act (42 U.S.C. 1320d-5, 1320d-6) shall apply to Business Associate with respect to such violation in the same manner that such sections apply to Covered Entity if it violates such provisions.

G. <u>Term and Termination</u>.

1. <u>Term</u>. This Agreement shall be effective as of the Effective Date and shall be terminated when all PHI provided to Business Associate by Covered Entity, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity.

2. <u>Termination for Cause</u>. Upon Covered entity's knowledge of a material breach by Business Associate, Covered Entity shall either:

   a. Provide an opportunity for Business Associate to cure the breach within 30 days of written notice of such breach or end the violation and terminate this Agreement, whether it is in the form of a stand-alone agreement or an addendum to a Master Services Agreement, if

Business Associate does not cure the breach or end the violation within the time specified by Covered Entity; or

b. Immediately terminate this Agreement whether it is in the form of a stand-alone agreement of an addendum to a Master Services Agreement if Business associate has breached a material term of this Agreement and cure is not possible.

3. <u>Effect of Termination</u>. Upon termination of this Agreement for any reason, Business Associate agrees to return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, maintained by Business Associate in any form. If Business Associate determines that the return or destruction of PHI is not feasible, Business Associate shall inform Covered Entity in writing of the reason thereof, and shall agree to extend the protections of this Agreement to such PHI and limit further uses and disclosures of the PHI to those purposes that make the return or destruction of the PHI not feasible for so long as Business Associate retains the PHI.

H. <u>Miscellaneous</u>.

1. <u>Indemnification</u>. To the extent permitted by law, Business Associate agrees to indemnify and hold harmless Covered Entity from and against all claims, demands, liabilities, judgments or causes of action of any nature for any relief, elements of recovery or damages recognized by law (including, without limitation, attorney's fees, defense costs, and equitable relief), for any damage or loss incurred by Covered Entity arising out of, resulting from, or attributable to any acts or omissions or other conduct of Business Associate or its agents in connection with the performance of Business Associate's or its agents' duties under this Agreement. This indemnity shall apply even if Covered Entity is alleged to be solely or jointly negligent or otherwise solely or jointly at fault; provided, however, that a trier of fact finds Covered Entity not to be solely or jointly negligent or otherwise solely or jointly at fault. This indemnity shall not be construed to limit Covered Entity's rights, if any, to common law indemnity.

Covered Entity shall have the option, at its sole discretion, to employ attorneys selected by it to defend any such action, the costs and expenses of which shall be the responsibility of Business Associate. Covered Entity shall provide Business Associate with timely notice of the existence of such proceedings and such information, documents and other cooperation as reasonably necessary to assist Business Associate in establishing a defense to such action.

These indemnities shall survive termination of this Agreement, and Covered Entity reserves the right, at its option and expense, to participate in the defense of any suit or proceeding through counsel of its own choosing.

2. <u>Mitigation</u>. If Business Associate violates this Agreement or either of the HIPAA Rules, Business Associate agrees to mitigate any damage caused by such breach.

3. Rights of Proprietary Information. Covered Entity retains any and all rights to the proprietary information, confidential information, and PHI it releases to Business Associate.

4. Survival. The respective rights and obligations of Business Associate under Section E.3 of this Agreement shall survive the termination of this Agreement.

5. Notices. Any notices pertaining to this Agreement shall be given in writing and shall be deemed duly given when personally delivered to a Party or a Party's authorized representative as listed in Section 8.7 of the agreement between the City and Grantee or sent by means of a reputable overnight carrier, or sent by means of certified mail, return receipt requested, postage prepaid. A notice sent by certified mail shall be deemed given on the date of receipt or refusal of receipt.

6. Amendments. This Agreement may not be changed or modified in any manner except by an instrument in writing signed by a duly authorized officer of each of the Parties hereto. The Parties, however, agree to amend this Agreement from time to time as necessary, in order to allow Covered Entity to comply with the requirements of the HIPAA Rules.

7. Choice of Law. This Agreement and the rights and the obligations of the Parties hereunder shall be governed by and construed under the laws of the State of Texas without regard to applicable conflict of laws principles.

8. Assignment of Rights and Delegation of Duties. This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective successors and permitted assigns. However, neither Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. Notwithstanding any provisions to the contrary, however, Covered Entity retains the right to assign or delegate any of its rights or obligations hereunder to any of its wholly owned subsidiaries, affiliates or successor companies. Assignments made in violation of this provision are null and void.

9. Nature of Agreement. Nothing in this Agreement shall be construed to create (i) a partnership, joint venture or other joint business relationship between the Parties or any of their affiliates, (ii) any fiduciary duty owed by one Party to another Party or any of its affiliates, or (iii) a relationship of employer and employee between the Parties.

10. No Waiver. Failure or delay on the part of either Party to exercise any right, power, privilege or remedy hereunder shall not constitute a waiver thereof. No provision of this Agreement may be waived by either Party except by a writing signed by an authorized representative of the Party making the waiver.

11. Equitable Relief. Any disclosure of misappropriation of PHI by Business Associate in violation of this Agreement will cause Covered Entity irreparable harm, the amount of which may be difficult to ascertain. Business Associate

therefore agrees that Covered Entity shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining Business Associate from any such further disclosure or breach, and for such other relief as Covered Entity shall deem appropriate. Such rights are in addition to any other remedies available to Covered Entity at law or in equity. Business Associate expressly waives the defense that a remedy in damages will be adequate, and further waives any requirement in an action for specific performance or injunction for the posting of a bond by Covered Entity.

12. Severability. The provisions of this Agreement shall be severable, and if any provision of this Agreement shall be held or declared to be illegal, invalid or unenforceable, the remainder of this Agreement shall continue in full force and effect as though such illegal, invalid or unenforceable provision had not been contained herein.

13. No Third Party Beneficiaries. Nothing in this Agreement shall be considered or construed as conferring any right or benefit on a person not a party to this Agreement nor imposing any obligations on either Party hereto to persons not a party to this Agreement.

14. Headings. The descriptive headings of the articles, sections, subsections, exhibits and schedules of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

15. Entire Agreement. This Agreement, together with all Exhibits, Riders and amendments, if applicable, which are fully completed and signed by authorized persons on behalf of both Parties from time to time while this Agreement is in effect, constitutes the entire Agreement between the Parties hereto with respect to the subject matter hereof and supersedes all previous written or oral understandings, agreements, negotiations, commitments, and any other writing and communication by or between the Parties with respect to the subject matter hereof. In the event of any inconsistencies between any provisions of this Agreement in any provisions of the Exhibits, Riders, or amendments, the provisions of this Agreement shall control.

16. Interpretation. Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with the HIPAA Rules and any applicable state confidentiality laws. The provisions of this Agreement shall prevail over the provisions of any other agreement that exists between the Parties that may conflict with, or appear inconsistent with, any provision of this Agreement or the HIPAA Rules.

17. Regulatory References. A citation in this Agreement to the Code of Federal Regulations shall mean the cited section as that section may be amended from time to time.