Exhibit D

City of Austin
Office of the City Auditor

Investigative Report

# Nonprofit Vendor Defrauded Austin Public Health

March 2023



Between December 2020 and September 2021, Central Texas Allied Health Institute (CTAHI), a nonprofit City of Austin contractor, committed fraud by misrepresenting over $1.1 million in financial transactions across three contracts with Austin Public Health. In total, CTAHI was improperly paid roughly $417,000 because of its fraudulent contract claims. In addition, CTAHI appears to have overstated its total vaccination numbers and fabricated patient information under its contract to provide Covid-19 vaccines.

# Contents

Allegation & Background .................................................................................... 2
Investigation Results ...................................................................................... 3
Appendix A - Subject Response ................................................................. 14
Appendix B - Office of City Auditor's Response to Subject Response ..... 22
Appendix C - Management Response ......................................................... 23
Investigation Criteria .................................................................................... 25
Methodology & CAIU Investigative Standards ........................................... 26

Cover (left to right): Austin Public Health, Facebook, August 2021; Austin Public Health, Twitter, July 2021.

# Allegation

*The city auditor may initiate... an audit or investigation if the city auditor determines that... fraud, waste, or abuse... or... illegality may have occurred or is occurring.*

*City Code § 2-3-7(D)(1) & (2)*

In October 2021, Austin Public Health informed us that Central Texas Allied Health Institute (CTAHI) may have provided falsified financial records to the department as part of its contract claims. Specifically, Austin Public Health expressed concern that CTAHI submitted altered or fabricated invoices, receipts, and bank statements to support its claimed expenses.

We investigated this matter pursuant to City Code § 2-3-7(D)(1) & (2).

# Background

According to its website, Central Texas Allied Health Institute (CTAHI) is a nonprofit college that seeks to "get underrepresented communities into careers in stable, fulfilling healthcare roles that they haven't had access to before." CTAHI was founded in August 2018.

Jereka Thomas-Hockaday is CTAHI's "principal founder," chief academic officer, dean of specialty programs, and co-owner. Todd Hamilton is CTAHI's campus president and is responsible for operations, including finances. Hamilton told us he kept CTAHI's books until a bookkeeper took over.

Austin Public Health's mission is "to prevent disease, promote health, and protect the well-being of our community." Austin Public Health contracts with many outside entities to achieve this mission. CTAHI was one of these entities.

From December 2019 to October 2022, CTAHI had four City contracts: one with the Economic Development Department (EDD), and three with Austin Public Health. This report focuses on the three Austin Public Health contracts, as we did not find evidence of fraud connected to the EDD contract. CTAHI was paid about $2.8 million in connection with its four contracts, most of which came from Austin Public Health. Austin Public Health issued its last payment to CTAHI in September 2021 and halted further payments after identifying potential fraud in CTAHI's submissions.

CTAHI's three contracts with Austin Public Health were for Covid-19 testing, workforce development, and Covid-19 vaccines. CTAHI's Covid-19 testing contract was deliverables-based, which meant CTAHI received

set payment amounts as it met specific goals outlined in the agreement. CTAHI's workforce development and Covid-19 vaccine contracts worked differently. They required CTAHI to pay for expenses before requesting reimbursement. Between December 2020 and September 2021, CTAHI submitted 23 claims for reimbursement to Austin Public Health under these two contracts.

In June 2022, CTAHI signed an agreement to repay Austin Public Health over $375,000 after Austin Public Health's internal audits found CTAHI submitted "inaccurate and falsified payment requests" in two contracts. As of March 2023, CTAHI had repaid Austin Public Health about $12,500, but had failed to pay over $68,000 in scheduled monthly payments, as laid out in its payment plan.

# Investigation Results
## Summary

Between December 2020 and September 2021, Central Texas Allied Health Institute (CTAHI), a nonprofit City of Austin contractor, committed fraud by misrepresenting over $1.1 million in financial transactions across three contracts with Austin Public Health. In total, CTAHI was improperly paid roughly $417,000 because of its fraudulent contract claims.

We found evidence that two of CTAHI's leaders, Todd Hamilton and Jereka Thomas-Hockaday, produced or submitted falsified documents and directed CTAHI employees to falsify contract-related records. Both denied doing so.

In addition, CTAHI committed fraud by submitting falsified performance reports to Austin Public Health under its Covid-19 vaccine contract. CTAHI appears to have overstated its total vaccination numbers and fabricated patient information in these reports.

We also referred these issues to the Austin Police Department, due to the potentially criminal nature of CTAHI's actions.

# Finding 1

## CTAHI misrepresented over $1.1 million in financial transactions and was paid $417,000 because of fraudulent claims

Of the 22 paid contract claims that CTAHI submitted across its three contracts with Austin Public Health, at least 11 claims contained falsified expenses.

The misrepresented financial transactions that CTAHI submitted to Austin Public Health include about $516,000 for its workforce development and vaccine contracts and about $604,000 in falsified expenses related to its Covid-19 testing contract, totaling roughly $1.1 million. Of the $516,000 in expenses for the workforce development and vaccine contracts, Austin Public Health reimbursed CTAHI for about $417,000 in falsely claimed expenses (see Table 1, below). The City did not reimburse CTAHI for any of the $604,000 in falsified expenses for the Covid-19 testing contract. This is because expenses for that contract were not eligible for reimbursement.

**Table 1: Fraudulent expense amounts by Austin Public Health (APH) contract**

| APH Contract | Misrepresented Expenses | Improperly Paid Expenses |
|---|---:|---:|
| Covid-19 Vaccines | $406,000 | $307,000 |
| Workforce Development | $110,000 | $110,000 |
| Covid-19 Testing | $604,000 | $0 |
| **Total (approximate)** | **$1,120,000** | **$417,000** |

APH paid CTAHI for most misrepresented expenses under the Vaccines contract.

APH did not pay CTAHI for misrepresented expenses under the Testing contract.

Source: Office of the City Auditor analysis, January 2023

### Fraudulent payments to CTAHI exceeded $417,000

CTAHI submitted falsified records to support expenses under both of its reimbursement contracts: the workforce development contract and the Covid-19 vaccine contract. CTAHI was paid about $417,000 as a result of these fraudulent expenses. CTAHI falsified many of the financial records it used to support its claimed expenses, including receipts, invoices, and bank statements.

Notably, CTAHI falsified records for roughly $362,000 in medical-supply purchases from a Houston company that, according to its website, offered "PPE Supplies to Government, Medical Hospitals or Professional 1st Responders, and NonProfit Organization." Specifically, CTAHI created fake transactions in its bank statements and ledgers to match these invoice amounts. Of this $362,000, Austin Public Health reimbursed over $263,000 in falsified purchases from this company. While other CTAHI suppliers shared original records to compare against documents CTAHI produced, this company did not provide records of CTAHI's purchases despite repeated requests from our office.

Additionally, CTAHI falsified many other expenses related to its workforce development and vaccine contracts, including costs for IT equipment, payroll, security services, rented lab space, and childcare. CTAHI did this by editing prices and dates on invoices and receipts for certain expenses. CTAHI also doctored entries in its bank statements, changing actual purchases to match the edited invoice or receipt. CTAHI created matching fake entries in its ledgers as well.

We identified these falsified elements by comparing the receipts CTAHI submitted to Austin Public Health to records obtained directly from CTAHI's suppliers (see Exhibit 1, below) and by comparing CTAHI's altered bank statements to statements obtained directly from CTAHI's bank.

**Exhibit 1: CTAHI's altered computer invoice (left) vs. invoice from supplier (right)**



Sources: Austin Public Health, October 2021; Office of the City Auditor analysis, November 2022

As noted above, Todd Hamilton is responsible for CTAHI's finances. In an interview, Hamilton did not clearly explain why or how CTAHI submitted falsified expense records to the City, but suggested a former employee who reported to him was responsible for falsifying receipts. During the same interview, Hamilton denied that he created falsified expense records.

### Testing contract ledger contained falsified expenses

In January 2021, CTAHI sent Austin Public Health a ledger containing over $604,000 in falsified expenses as part of its Covid-19 testing contract. 45% of the expenses listed in the ledger were misrepresented in some way. As noted above, under this contract CTAHI received payment only after meeting specific goals, or deliverables. CTAHI received $100,000 from Austin Public Health after submitting this ledger, which was part of a contract deliverable. Austin Public Health did not reimburse CTAHI for any expenses contained in the ledger.

In an interview, Hamilton denied creating this ledger and claimed not to know who did. Separately, Jereka Thomas-Hockaday told us Hamilton prepared this ledger. Thomas-Hockaday submitted the contract claim that included this ledger to Austin Public Health. Thomas-Hockaday also provided many of the supporting records for expenses listed in this ledger to Austin Public Health in early to mid-2021. Many of these supporting records were falsified, with altered transactions, amounts, and dates.

For example, in March 2021, CTAHI sent a falsified receipt to Austin Public Health for a purchase from a home improvement store (see Exhibit 2, below). According to CTAHI's receipt and the ledger described above, this nearly $2,700 order was placed in late September 2020. However, the

*Under a deliverables contract, a vendor is paid "for a report or product that must be delivered to the City... to satisfy contractual requirements." Deliverables "can include goods or finished works, documentation of services provided or activities undertaken, and/or other related documentation."*

store's website indicates this order was placed for a much smaller amount, then ultimately canceled, a few days before CTAHI sent the receipt to Austin Public Health in March 2021. The falsified receipt contains miscalculated subtotals and an inaccurate sales tax amount. CTAHI also submitted altered versions of its bank statements to falsely indicate CTAHI paid this expense. Notably, the real online order was placed using Hamilton's personal email address. In an interview, Hamilton denied creating this falsified receipt.

**Exhibit 2: CTAHI's falsified testing supplies receipt (excerpts of three-page document)**



| | |
|---|---|
| Order # 861598038 / Order Date: 09/25/2020 | This order was actually placed in March 2021, then canceled |
| Unit Price $4.48 Quantity: 2 Total: $9.96 | Miscalculated item subtotal |
| Subtotal: $2,480.92  Tax: $211.04 | Miscalculated sales tax |
| Total:$2,691.96 | Total appears in CTAHI's altered bank statements, not its real statements |

Sources: Austin Public Health, October 2021; Office of the City Auditor analysis, November 2021

### Hamilton and Thomas-Hockaday produced falsified documents

Hamilton produced nine monthly ledgers containing falsified expenses for reimbursement, and at least two falsified invoices or receipts that CTAHI submitted to the City to support its claimed expenses. One of these is a May 2021 invoice, from the Houston company described above, for over $68,000 in medical supplies (see Exhibit 3, below).

The properties of this electronic file indicate Hamilton created the invoice just three days before CTAHI sent it to Austin Public Health, in October 2021. CTAHI provided two versions of this invoice to the City. Though intended to justify the same transaction, the invoices had different invoice numbers.

Additionally, this invoice contains quantities of items that appear excessive based on the vaccine contract's performance goals. For example, the invoice indicates CTAHI purchased 200,000 syringes, when the contract goal would have likely required approximately 17,000 syringes, and CTAHI's claimed vaccination performance would have likely required approximately 3,500 syringes (see Finding 2 for more detail on falsification related to the Covid-19 vaccination contract). CTAHI also provided an

CTAHI submitted an invoice for 200,000 syringes even though its contract was for just 17,000 vaccinations. Ultimately, CTAHI appears to have administered roughly 2,500 vaccinations.

altered version of its August 2021 bank statement to indicate it paid this invoice amount. However, CTAHI's authentic bank statements show it did not make this payment in August 2021.

**Exhibit 3: CTAHI's falsified vaccine supplies invoice**



Sources: Austin Public Health, October 2021; Office of the City Auditor analysis, November 2022

Hamilton admitted creating the May 2021 ledger but denied creating the invoice submitted as support for the ledger. Hamilton claimed he did not know enough about computers "to change a PDF document." When asked why CTAHI sent us multiple versions of the same invoice from this company, Hamilton said, "I'm trying to figure out why did I have that. No answer. No comment. No question... fifth."

Thomas-Hockaday submitted seven contract claims that contained falsified expenses, including medical supplies and lab rental fees. In addition, document properties for one ledger containing falsified expenses indicate Thomas-Hockaday created it. This ledger was attached to a contract claim. When submitting each contract claim to Austin Public Health in an online contracting system, Thomas-Hockaday certified that "all information provided is correct."

According to several witnesses, Hamilton worked with CTAHI employees in his office to falsify contract-related documents in 2021. Witnesses said they observed Hamilton produce and alter receipts and bank statements on his computer. Some said the goal was to make CTAHI's records match the expenses it had already asked Austin Public Health to reimburse. In our

*Investigation Criteria:*

FRAUD includes, but is not limited to: ... the misappropriation of funds, supplies, or other City resources, through methods including, but not limited to theft, embezzlement, or misrepresentation... the intentional improper handling of or reporting of money or a financial transaction.

*City Code § 2-3-5(A)(2)(b) & (c)*

See Investigation Criteria *for details.*

interview with Hamilton, he admitted meeting with CTAHI staff to compile contract documents but denied falsifying records.

Witnesses also alleged that Thomas-Hockaday directed them to misrepresent or falsify records, some of which were related to a City contract. When interviewed, Thomas-Hockaday denied that anyone at CTAHI, including herself, asked staff to alter contract records. Instead, Thomas-Hockaday blamed two former CTAHI employees for spreading what she described as false accusations. On the other hand, in December 2021, CTAHI's attorney sent us a letter asserting that CTAHI's internal investigation found that contract-related records were falsified.

Additionally, Thomas-Hockaday argued that she did not review the contents of contract claims or other documents she provided to the City. Referring to potential falsification in CTAHI's records, Thomas-Hockaday claimed she "had an enormous amount of work and didn't check what was being done at an adequate level."

By submitting falsified financial records to receive City funds, CTAHI committed fraud as defined in the following portions of City Code:

- City Code § 2-3-5(A)(2)(b) & (c)

# Finding 2

## CTAHI falsified its vaccine contract performance by overstating vaccination totals and fabricating patient data

CTAHI's Covid-19 vaccine contract lasted from May through September 2021. The contract contained a performance goal of roughly 17,000 vaccinations.

CTAHI's vaccine contract required the nonprofit to submit performance reports to receive reimbursement payments. Jereka Thomas-Hockaday sent Austin Public Health two versions of a final performance report that was supposed to list all vaccinations given during the contract: the first in late September 2021 and the second in late October 2021.

CTAHI's performance reports appear to overstate vaccination totals by 20% to 30%. Additionally, CTAHI's report entries for one date in early June 2021 appear to contain falsified patient data. Finally, Todd Hamilton appears to have directed CTAHI employees to fabricate clinic records, including those related to the nonprofit's Covid-19 vaccine contract.

### Overstated vaccination totals

In its final report to Austin Public Health, CTAHI claimed it administered about 3,500 Covid-19 vaccinations. However, CTAHI appears to have overstated this number by roughly 1,020 doses, or about 30%. As noted above, CTAHI's vaccine contract required the nonprofit to provide accurate performance reports to receive contract payments. Nevertheless, Austin Public Health would not have paid CTAHI more if it vaccinated more people. This is because CTAHI's vaccine contract allowed for payments only in the form of reimbursements for "expenses incurred and paid."

We identified these overstatements by comparing CTAHI's final report to Austin Public Health against other vaccine records, including state immunization data, patient forms that CTAHI collected, and other internal CTAHI records. CTAHI's report contained vaccination totals that exceeded all other sources of vaccine numbers, particularly state immunization data and CTAHI's patient forms. Both sources had totals with about 1,000 fewer vaccinations, representing 30% of CTAHI's claimed total.

In addition, while most patient forms included a vaccination date, this field was missing from roughly 340 patient forms. It is possible some of these patient forms represent vaccine doses administered during the City's Covid-19 contract. If one includes patient forms without a vaccination date in the vaccination totals, CTAHI's final performance report still appears to overstate the number of vaccinations by nearly 680 doses, or about 20%.

**Reports contain falsified vaccine data for at least one date in June 2021**

CTAHI's final reports indicated the nonprofit administered over 1,000 vaccines on a single day: June 5, 2021 (see Chart 1, below). However, most other sources of vaccine data, including internal CTAHI records, suggest the nonprofit issued a small fraction of this amount on this date. CTAHI's patient medical forms, for instance, suggest the nonprofit administered only 59 vaccine doses on this date. A witness with knowledge of vaccine operations confirmed CTAHI's clinic could not have vaccinated over 1,000 people in a day. According to this witness, the clinic saw a maximum of about 80 vaccine patients in one day.

**Chart 1: CTAHI claimed it vaccinated over 1,000 people in a single day**



Source: Office of the City Auditor analysis, December 2022

CTAHI appears to have entered false information in its vaccine performance reports for June 5, 2021. We were unable to verify the identities of the people CTAHI claimed it vaccinated in its report when we compared report entries to CTAHI's patient forms. Additionally, CTAHI's vaccine entries for June 5 contained 131 repeated dates of birth, including day, month, and year. 57 dates of birth repeated at least 10 times, with a single date of birth repeating 30 times in the 1,086 entries. Further, some entries suggest the same person received both their first and second vaccine doses on June 5, 2021.

## Hamilton directed employees to invent clinic data

Finally, three witnesses said Todd Hamilton asked CTAHI staff to make up or manipulate information related to CTAHI's testing and vaccination clinic. One witness stated that Hamilton directed an employee to fabricate information in a vaccine spreadsheet in late September 2021. Specifically, Hamilton told the employee to make up Texas cities to match existing zip codes in the spreadsheet. When the employee asked Hamilton what to do if a zip code contained multiple cities, Hamilton directed them in a text message to pick the city closest to Austin.

The day after the CTAHI employee told Hamilton they had finished with the spreadsheet, Jereka Thomas-Hockaday sent an early version of CTAHI's final vaccine report to Austin Public Health, in late September 2021. About a month later, Thomas-Hockaday submitted an updated version of CTAHI's final vaccine report that included some additional vaccination entries from the end of the contract. Both versions appear to contain fabricated vaccine records. In the process of submitting this report, Thomas-Hockaday certified "that all information provided is correct and represent[s] actual program clients served."

In interviews, Hamilton and Thomas-Hockaday made conflicting statements about vaccine records. For example, when asked if state immunization records are accurate, Hamilton said, "Yes... Yes and no. And honestly, I would say no." Thomas-Hockaday said state immunization records should provide an accurate count of vaccinations based on patient medical forms. In addition, Hamilton said CTAHI collected a patient medical form for every person vaccinated, adding that these forms should provide an accurate count of people vaccinated. On the other hand, Thomas-Hockaday suggested some people who received vaccines from CTAHI refused to fill out these forms.

*Investigation Criteria:*

FRAUD includes, but is not limited to: ... the misappropriation of funds, supplies, or other City resources, through methods including, but not limited to theft, embezzlement, or misrepresentation.

*City Code § 2-3-5(A)(2)(b)*

*See* Investigation Criteria *for details.*

Both subjects denied inflating vaccination numbers and asking CTAHI staff to make up patient data for the testing or vaccine contracts. However, Hamilton said he took responsibility for instances in which he and other CTAHI staffers may have mistyped vaccination numbers, which could have resulted in "extra zeros" in a spreadsheet. "Extra zeros" mistakes would not explain CTAHI's overstated vaccination totals in its performance reports, which contain individual entries with patient demographic information for each vaccine dose.

In May 2022, Austin Public Health reported multiple concerns about CTAHI's vaccine reports to a State of Texas government agency. These concerns included apparent data entry errors, missing patient data in the state's immunization database, and the discrepancy of over 1,000 Covid-19 vaccine doses between CTAHI's reports to Austin Public Health and state records.

By falsifying its vaccine contract performance reports, CTAHI appears to have committed fraud as defined in the following portion of City Code:

- City Code § 2-3-5(A)(2)(b)

# Additional Observation 1

## Embezzlement allegations

We received multiple allegations that Todd Hamilton may have embezzled money from CTAHI, though we could not confirm this. Witnesses alleged that Hamilton may have stolen between about $30,000 and $60,000 from CTAHI by transferring funds from one of CTAHI's bank accounts to his personal bank account.

Financial records from CTAHI's accounting system and bank account confirm Hamilton received large sums from one of CTAHI's bank accounts outside of normal payroll procedures. According to CTAHI's authentic bank statements, about $60,000 was transferred directly from CTAHI's checking account to another bank account between late 2020 and mid-2021. CTAHI's authentic general ledger categorizes these expenses as payments to Hamilton, and Hamilton confirmed receiving these transfers. The amounts transferred per month varied between $500 and nearly $13,000. In addition, CTAHI's bank statements indicate Hamilton received another $60,000 in transfers through a third-party payment system between late 2019 and late 2021, in amounts ranging from $700 to $9,000 per month. In January 2021 alone, Hamilton appears to have received close to $19,000 in transfers from one of CTAHI's bank accounts.

As noted above, CTAHI provided altered versions of its bank statements to Austin Public Health. The statements had been edited to remove evidence of some third-party transfers to both Hamilton and Thomas-Hockaday. Thomas-Hockaday received over $34,000 in third-party bank transfers in a two-year period. Thomas-Hockaday said she and Hamilton received such transfers as wage payments because CTAHI ran out of paper checks. However, CTAHI's authentic bank statements make clear CTAHI paid employees by direct deposit and with paper checks before, after, or on the same day Thomas-Hockaday received third-party bank transfers. CTAHI's attorney later explained that Thomas-Hockaday also received some grant payments unrelated to City contracts that may have been categorized as "contractor" compensation.

Hamilton denied stealing from CTAHI and described the allegation as "hilarious." He added, "I wish I did actually have money." In a subject interview with Hamilton, he claimed he received thousands of dollars in bank transfers because he was an independent contractor for CTAHI. Hamilton said he was responsible for CTAHI's clinic, in addition to serving as the nonprofit's full-time campus president: "I got paid for extra work." Despite this, Hamilton said he did not think a contract, which would have defined pay rates and job duties, existed between himself and CTAHI.

While Thomas-Hockaday said she approved Hamilton's contractor arrangement, CTAHI's explanations and tax forms for Hamilton's contractor payments do not match CTAHI's financial records. For example, CTAHI's general ledger states Hamilton received over $20,000 in contractor payments in 2020. When asked for tax records to support Hamilton's contractor payments, CTAHI's attorney said CTAHI did not have any tax forms prior to 2021 "as we did not have a contract with the city to

open and operate a testing and vaccine clinic until 2021." In fact, CTAHI's testing contract with the City began in August 2020.

Further, CTAHI's 2021 tax records do not match CTAHI's general ledger. Specifically, CTAHI's 2021 tax form for contractor payments indicates Hamilton received about $82,000 in contractor payments that year, while CTAHI's original general ledger states Hamilton received just $15,000 in contractor payments in 2021.

## Additional Observation 2

### Oversight issues at Austin Public Health

In practice, Austin Public Health did not require CTAHI to submit general ledgers that met the terms of its contracts. Austin Public Health contract managers confirmed CTAHI was not required to submit general ledgers from an accounting system as required by its contracts. Specifically, these contracts state that for reimbursable agreements, vendors must provide "a report of... expenditures generated from the Grantee's financial management system." CTAHI's exemption from this requirement may have enabled it to seek payment for expenses that did not match its actual general ledger. One Austin Public Health employee told us CTAHI's "ledgers were a mess," adding that the nonprofit "couldn't submit accurate information... that made sense... that would add up."

Austin Public Health staff and managers provided various explanations for CTAHI's exemption from this requirement. For example, staff said the department has made exceptions for smaller, newer contractors, which may not have formal accounting systems. However, CTAHI purchased a popular brand of accounting software in December 2019, which is when its banking transactions appear in its general ledger. This was several months before its first contract with Austin Public Health. Hamilton told us he did not use this software to prepare CTAHI's expense claims because Austin Public Health staff did not instruct him to do so.

Witnesses made clear contract managers cannot, and are not expected to, verify every expense. However, several Austin Public Health employees said they expressed concerns to management about CTAHI's financial records. In July 2021, for example, a staffer notified their manager of potential fraud in CTAHI's financial records. The manager did not address this issue. Some witnesses said Austin Public Health staff are not qualified to identify fraudulent transactions. Some also said the department needed better guidance on how to handle fraud concerns. Nevertheless, as noted above, Austin Public Health audited CTAHI's records, identified many suspicious expenses, and informed us of probable fraud.

Witnesses at Austin Public Health described several other factors that could have affected oversight of these contracts. Several said contract managers handled too many social service contracts to oversee them effectively. Multiple witnesses also described staffing shortages and inconsistent or inadequate contract management training. Finally, witnesses described Covid-19-related contracts as challenging for Austin Public Health to manage. One staffer said pressure to disburse a large

sum of pandemic funds into the community "set the stage for a bunch of unfortunate... oversights."

Finally, witnesses also expressed concern that CTAHI's contracts with Austin Public Health were not sourced competitively. Indeed, none of CTAHI's City contracts went through a competitive procurement process. For its three contracts with CTAHI, Austin Public Health cited the City's decision "to waive normally required competition in order to expedite a purchase necessary to support the City's response to the COVID-19 pandemic."

## Additional Observation 3

### Misrepresentation to a state government agency

In July 2021, a State of Texas government agency determined CTAHI "knowingly and intentionally provided false information" by "misrepresenting the location" of CTAHI's training facility. Specifically, in May 2021, CTAHI told the state agency it was no longer holding trainings at an unapproved location. The state agency determined this statement was inaccurate and imposed $2,000 in administrative penalties against CTAHI for this issue and for operating without a certificate of approval.

# Appendix A - Subject Response

Response:

Background

Response 1:

CTAHI was founded in 2018 by Dr. Jereka Thomas-Hockaday, Todd Hamilton, and ▇▇Co-founder▇▇. Dr Thomas- Hockaday is the Principal Founder and Vice President of Institutional Effectiveness. Mr. Hamilton serves as Campus President.

Response 2:

At no time was Todd Hamilton in charge of finances. CTAHI is governed by a board of directors, one of which is a Certified Public Accountant, who has been in charge of regular reconciliation of campus bookkeeping since the start of fiscal year 2023. The organization also uses an independent human resources company to file all quarterly taxes and an independent CPA firm that conduct a yearly audit of the organization. During the time the COVID was in operation, CTAHI board of directors decided to hire a bookkeeper to help with the man hours needed to manage such a large grant and leave Mr. Hamilton to manage the operations of the clinic. After the grant ended, the bookkeeper was released.

Mr. Hamilton's role of supervision of finances is two responsibilities. First, Mr. Hamilton has general oversight of the Enrollment Services Department, which includes the Student Financial Aid Department. He does not have any direct purview of individual student accounts, which is consistent with regulations surrounding financial aid as laid out in the Texas Administrative Code governing career school and colleges and the U.S. Department of Education. Those responsibilities fall to the Financial Aid Director and the Executive Director of Enrollment Services. Mr. Hamilton second responsibility is to oversee general campus operational budgeting and spending.

Response 3:

CTAHI did agree to pay Austin Public Health the agreed upon amount, but only after the auditor's office informed us of the fraud allegations and an internal investigation by our campus attorney uncovered that falsification had occurred, but not by Mr. Hamilton, but by that several disgruntled employees who had been fired for egregious acts ranging from stealing intellectual property that was covered in a company non-disclosure agreement, falsifying receipts for the purpose of retaliation for being terminated, refusing a drug test after a workplace injury and admitting to both Dr. Thomas-Hockaday and Mr. Hamilton that they were under the influence of a controlled substance at the time of the injury, stealing and publishing payroll information company wide and excessive absences and no call no shows, and working with fellow employees to sell COVID-19 vaccine cards.

Response 4:

While it is true that CTAHI has had a difficult time making the agreed upon payment to the City, it only because of the direct actions of the city auditors reaching out of the scope of the investigation to build a case that was founded on purely circumstantial evidence, provided to them by the most unscrupulous and unethical individuals in the organization. CTAHI has learned that these same individuals are the name "witness" the auditors have used to build their case of fraud against the campus.

Response 5:

Before the inception of the contract, CTAHI had a healthy philanthropic portfolio, as with any successful non-profit. All private foundations that support CTAHI have reported to the campus attorney that the auditor's office contacted them to let them know that they were "investigating possible fraud" by the organization and inquired about the status of grants given to CTAHI. One such organization was told that they were "being warned." A partner organization working with CTAHI at the clinic, but had a separate contract was sent the signed APH repayment agreement from someone from the city system and told "do not continue to work with them if you don't want to get caught up too." This abhorrent overreach has caused all but two funders to pull their support of the organization and caused a financial situation that has led to decreased enrollment, employee layoffs, and pulling out of a contract that would have made the organization solvent and able to pay the total agreed amount debt back quickly. On February 28, 2023, CTAHI pulled from a small emergency reserve and a check for $68,000 was sent to the City of Austin to fulfill the request from the City Attorney's office.

In addition, almost all individuals who have left the company have communicated to CTAHI legal department that they were contacted by the auditors' offices numerous times. Individuals who had no contact with the clinic or knowledge of its operations. Several stated that the repeated insistence that they give testimony felt like "harassment" and had feelings of being "scared" by the way they were treated by city staff. During a site visit by investigative staff a CTAHI employee reported to Dr. Thomas-Hockaday that the City contract manager, who was white, stated to them, "I can't stand Mr. Hamilton. I don't understand how y'all can work with Mr. Hamilton. He is so hostile and abrasive." This is a familiar troupe used against black men to diminish their character and stoke fear. Dr. Thomas-Hockaday reported this incident the City administration and stated that she was not confident in the ability of the City contract manager to work with CTAHI. Dr. Thomas-Hockaday assumed this would be handled with the removal and replacement of the manager, but that did not happen, and the organization was forced to continue the contentious relationship with very little trust or faith in a fair audit and/or investigation. A contractor that worked with CTAHI during the vaccine contract as well as other City of Austin contractors told campus legal that during their interview, the questionis presented were a blatant attempt to build what seemed a deliberate "assassination campaign" against CTAHI. Additionally, the individual stated that they felt this interview was "yet again another attempt by the City of Austin to take down a black organization" the interviewers ended the session abruptly and never contacted them again.

Investigation Results

Response 1:

Fraud is defined as, "wrongful or criminal deception intended to result in financial or personal gain." At no time did CTAHI, Dr. Thomas-Hockaday, or Mr. Hamilton engage in any activity with criminal intent or deception or with the hopes of financial gain. CTAHI leaders saw the absolute abysmal treatment of BIPOC citizens during the pandemic and stepped forward to help. They saw it firsthand because many CTAHI students and their families were victims of this systemic racism in healthcare that has plagued the city for centuries and could not sit idly by and watch its community die without trying to do something to help. CTAHI does admit that some mistakes were made in the execution of the billing, but that was 100% the result of extremely inadequate and inappropriate guidance from the city staff. Dr. Thomas-Hockaday consistently stated this on conference calls and in writing to the city administration. She told management at APH that she felt like the situation was chaos and staff seemed to not understand what

they were doing and worried CTAHI would pay the price for the chaos, which is exactly what has happened.  As has been in its long history, the City of Austin has once again demonstrated that it has a serious problem with its relationship with black citizens.  In an all too familiar playbook, the city is attempting to mar the reputation of a black-founded organization doing business with the city, instead of admitting that it did not provide the same level of guidance and assistance given to successful new white contractors. The city is now taking great lengths to absolve itself of the significant errors committed that caused this unfortunate situation to occur.

Finding 1- Misrepresentation of Transactions

Response 1:

Many of the incidents cited in this section are the result of constantly changing backup documentation requirements requested by the agency to CTAHI during the duration of the contract.  There is inconsistency in the invoicing because each time an invoice was submitted, the contract manager and supervisory staff asked for those changes.  All payroll ledgers and supporting documentation were compiled and assembled in accordance with Austin Public Health requests and the use of templates provided by and approved by APH grant manager and several levels of agency leadership.  At no point did anyone question the submissions and Dr. Thomas-Hockaday stated in writing and in an email that the organization "was happy to submit documentation in any form that the agency seemed fit for approval" None were rejected therefore all submissions were assumed by CTAHI to be correct and acceptable.

Response 2:

The contractor in question in this section of the report was a supplier that was recommended to CTAHI by a high-level city official who told CTAHI they had worked with them in the past and was in good standing with the city.  Naturally, the campus took the recommendation and used the contractor.  The relationship between CTAHI and the contractor started off mutually beneficial, but over time, CTAHI began to see suspicious behavior from the owner of the company.  After a routine monthly reconciliation, the bookkeeper reported to Mr. Hamilton and Dr. Thomas-Hockaday that the vendor had illegally siphoned over $20,000 out of the CTAHI bank account through an overlay program on Dr, Thomas-Hockaday's bank account app.  CTAHI is now separately pursuing criminal charges against the individual for theft.

Response 3:

One of the witnesses that provided information to the City Auditor was a member of the Executive Management Team for the campus and the project manager for the COVID testing vaccine clinic.  The individual was initially granted the ability to work from home during lockdown and had a company desktop terminal with virtual access to the organization campus operations system, and passwords and access to Mr. Hamilton's personal work management system.  This was done to ensure that in case Mr. Hamilton became incapacitated or unable to fulfill the duties of the operation manager for the clinic someone would be able to step into that role immediately.  A large portion of the work that was done as the project manager was to keep track of expenditures, such as receipts of purchases and ensuring all items needed for claims were included in the monthly submission packet that Dr. Thomas-Hockaday submitted as she was the only person given a Partnergrants account for the Clinic Contract.

After the lockdown order lifted, all employees were instructed to return to the office during normal business hours with COVID-19 masking and distance restrictions in place. The individual mentioned above refused to adhere to the return-to-work policy and the working relationship deteriorated rapidly. The employee who lived in the same neighborhood as Mr. Hamilton showed up at the neighborhood social club and initiated a combative argument with Mr. Hamilton in front of everyone in the establishment to the point where he felt threatened and left the establishment.  When those tactics were not effective in achieving the employees' goal of remaining remote, the individual began contacting the human resource specialist and became insistent on gaining access to all employee personnel files.  When they were refused access, the employee started coming into the office and numerous witnesses stated they saw the individual making physical copies of employee files that contained salary information and other private employee data.  These files were then passed out to other employees. Employees told CTAHI legal department that it was clear to them that this employee's intent was to use their position of power to foment discourse among the staff and blackmail Mr. Hamilton and Dr. Thomas-Hockaday into getting what they wanted.  When this did not happen, the employee then confronted Dr. Thomas-Hockaday in her office with Dr. Thomas-Hoackaday's Executive Assistant present and engaged in a shouting match with her.  The individual resigned immediately and went to retrieve personal items and left.

During interviews with Dr. Thomas-Hockaday and Mr. Hamilton, examples of falsified documents were presented to them by the auditor's office. Mr. Hamilton did admit that he created the ledger, but they were based invoices and receipts given to him by clinic staff and the project manager.  The same three individuals that were fired for the serious violations aforementioned in the beginning of this document and are now materials witnesses in the auditor's investigation.  Mr. Hamilton maintains he did not create any of the submitted invoices. Dr. Thomas-Hockaday had no purview over the clinic, therefore all receipts and invoices presented to her at the time of the interview were not documents she had ever seen before and nor could provide any additional information on who or how they were created. Dr. Thomas-Hockaday did admit to uploading the documents into the ParnterGrants grants system, after they had been checked by the project manager and uploaded onto a thumb drive. Dr. Thomas-Hockaday did admit that she did not review the documents before submission because she trusted those who had complied the work. She did not assume that information was falsified in certifying that "all information was correct," she did so with a thought process that it was indeed correct.

 Dr. Thomas-Hockaday however did state in the interview and maintains that she believes the individual that was the project manager over the clinic created the documentation out of malice and ill intent towards Mr. Hamilton, because she was told that she would have to come back to work full- time in the office or resign her position.  Dr. Thomas-Hockaday was asked why the individual would engage in such behavior, and she explained that this person had a history of unethical behavior, combative nature, insubordination, abuse of power and was unliked by almost all the staff in the office.  She further stated that on the day of her resignation they were going to relieve her of her duties in her current position and reassign her to a data entry position, which was a remote, temporary position, after which the clinic would close, because it was clear that her presence was becoming a toxic force in the day to day environment in the building.

Response 4:

# Appendix A - Subject Response (continued)

Dr. Thomas-Hockaday had no working knowledge of the day-to-day operation of the clinic nor documentation regarding the clinic operations as she is in charge of the academic and philanthropic functions of the organization. She could not have instructed any staff to falsify any documentation as she was not even aware of documentation needed during the operations of the clinic. The only responsibility she asserted was to submit the claims paperwork and attend weekly meetings if Mr. Hamilton was going to be absent. There was one ledger that was created by Dr. Thomas-Hockaday, because Mr. Hamilton was on vacation with his family and the contract manager asked her to create, because they were on a deadline and needed to get it submitted. The contract manager literally sat on a phone call and instructed Dr. Thomas-Hockaday on what to put in the ledger, therefore this could not have been a fraudulent document because APH staff assisted in creating and submission of the ledger.

Finding 2- Vaccine Falsification Performance

Response 1:

In September of 2021, Dr. Thomas-Hockaday did submit the performance review on vaccine performance. The document was sent back to us by APH staff stating that there were revisions that needed to be made to the document. Mr. Hamilton met with staff, discussed the revisions which affected performance numbers and a new submission was sent in October. There was no intent to misrepresent any vaccine numbers, those revisions were made at the request of Austin Public Health.

Response 2:

CTAHI patients' forms were not filled out by CTAHI staff, but rather by the patients themselves. According to HIPPA regulations, CTAHI staff is prohibited from altering any data entered on a form by patients. Therefore, if there is missing data on patient forms, it is the patients themselves who did enter that information. However, the patient ledger that CTAHI vaccine staff filled out and submitted daily, reflects the actual number of patients seen that day as the accurate count. CTAHI utilized a third-pRTY contractor recommended by APH to enter vaccine data into the patient system. Copies of the files were picked up on Monday by the contractor to be entered into the system and CTAHI kept originals. It was not until the end of the contract and the auditor's investigation, that we were alerted by the state that the vaccine numbers did not match our records. After this notification, Mr. Hamilton went into the system to pull test data, and indeed Dr. Thomas-Hockaday and her entire family's vaccine records had not been logged into the system although they had received all vaccinations at the clinic. Therefore, although this was a mistake of not executing proper due diligence, it is NOT a case of purposeful misrepresentation of vaccine performance, because, as stated in the auditor's report, a higher number of vaccines would not have resulted in any more payments to the entity.

Response 3:

CTAHI further disagrees with the notion of any false number reporting. The report that is in question does in fact state 1,086 doses administered on that date. However, it also states doses administered in 1987, 1992, 2007, 2008, and 2009! This report is obviously wrong, with no intent of misleading, but in fact, not proofed, by CTAHI nor the Account Manager provided by the City of Austin, before being approved.

Response 4:

The issue of Mr. Hamilton's guidance to staff regarding input of zip codes and Texas cities into the spreadsheet is as follows: The state immunization system does not allow input of patient data information without a valid city and zip code. Many patient forms were missing this information and without it, the patient data cannot be entered. When staff asked Mr. Hamilton how to bypass this issue, he did instruct to pick a city that was in the zip code and closest to Austin. This was not a fraudulent act of malice it was a snap judgement made during a very chaotic time to create a work-around for a poorly designed state system that did not anticipate properly patients' error in filling out paperwork.

Response 5:

Dr. Thomas-Hockaday did in fact mistakenly send an early version of the vaccine numbers and when APH alerted her, the issue was corrected. It was a simple mistake and was not done to defraud any entity. Dr. Thomas-Hockaday maintains that she nor Mr. Hamilton at any point instructed any staff to fabricate vaccine patient paperwork. As veteran healthcare workers with a combined approximately 50 years of experience but Dr. Thomas-Hockaday and Mr. Hamilton understand the egregiousness of such an act. Additionally, this is not consistent with a pattern of behavior because neither individual has any record of being discharged or reprimanded on a job for such an act. Furthermore, because Dr. Thomas-Hockaday did not have any experience with the state vaccine system and/or the day-to-day operations of the clinic, the response that the state should provide an accurate record of vaccine data would be an uninformed assumption, that is not based in fact and Dr. Thomas-Hockaday feels this question was asked to entrap her into building a narrative of fraud.

Response 6 :

There were no requirements for COVID vaccines, only for testing with equaled to 80 patients per day. Using the provided reports and templates from the City of Austin, there is documented proof of patients freely signing up for testing, which was completed by CTAHI staff. This fulfilled the requirements for the COVID testing.

The statement of only being able to vaccinate 80 patients a day is also erroneous. There was an average of no less than 4 bodies to inject patients, as well as extra bodies to monitor patients at all time. CTAHI also had no less than 20 seats for patients to sit the required 15 minutes for monitoring. With operating hours no less than 4 hours per day, the math makes that statement in poor judgment and false, by the "witness" and the City's Auditor's office.

Moreover, the report in question has 3,503 vaccinations given. To isolate a specific date and claim falsification of records shows a narrative that is attempting to be written for the demise of a black founded non-profit organization, in the city of Austin. These are allegations meant to destruct not correct, and is an obvious tactic of amplifying errors, and weaponizing them for bad faith purposes.

Observation #1

Response 1:

# Appendix A - Subject Response (continued)

In late 2020 CTAHI bank account was hacked, so a second account was opened. The 60,000 mentioned here was to establish the new account and to allow other private funds to flow through this second account separate from public dollars. This was not done with any intent to fraud the city government but the opposite, to be more transparent.

Response 2:

CTAHI held independent private clinics for business and organization that paid for the campus services. Additionally, student and community personnel were utilized at these private events as the static clinic staff could not utilize. Because CTAHI mission is to help individuals in poverty get experience and work in the medical field, many of the worker were poverty level citizens. A vast majority of these individuals did not have banks accounts in which they could cash a paper check. They did however have electronic payment apps in which to receive money (ie ███████ Payment apps ███████, etc). CTAHI business bank account did not allow for such payment to such entities; therefore Mr. Hamilton transferred these sums into his own bank account then disbursed the money accordingly. This was common practice for several organizations that received pandemic relief funds to pass to poverty-stricken communities. In some cases, direct cash payment were given straight to community members hands. Attached is documentation showing these transfers. Additionally, all individuals who fell under this category were given W-9 forms to fill out and can be provided to the auditors' office at their request. This question was not asked of Mr. Hamilton or Dr. Thomas-Hockaday during the interviews and it is now clear that this was omitted to paint a narrative that justified the claims that Mr. Hamilton was embezzling funds.

Response #3:

When Dr. Thomas-Hockaday submitted bank statement to Austin Public Health, she asked that they be redacted because of concerns for private entity payment and tuitions from other students that fall under privacy policies that requires by career college and private donors. APH agreed to receive the redacted documents and nothing further was mentioned to Dr. Thomas-Hockaday. Later the auditor's office requested unredacted documents in which, again, Dr. Thomas-Hockaday expressed privacy concerns, but those concerns were ignored, and the office demanded unredacted statement. Just as Dr. Thomas-Hockaday fears, the information given to the auditor's office was indeed used for ill intent to create a narrative of fraud and embezzlement that simply does not exist. It is indeed true that Mr. Hamilton was paid separately for work as the operations manager at clinic because he was performing a service outside of his duties as Campus President. The 2020 amount of $20,000 made in contractor payments were made to Mr. Hamilton for private vaccine events. CTAHI did indeed submit a W-9 form for Mr. Hamilton showing he was placed as an independent contractor for the company. The $82,000 mentioned in the report is an inaccurate reflection of what Mr. Hamilton received in 2021. The forms submitted to the auditor's office are W-2 for his regular salary of 84,000 as Campus President and a separate W-2 for his work as Operations Manager in the amount $31,000. Which is, ironically, the exact amount that the "witness" told the auditor's office Mr. Hamilton embezzled from the company. See attached W-2s. The testing contract was based on number of community members vaccinated and did not give any specifics on report how money was allocated. Documentation required for payout of this grant was reported showing an average of 80 persons per day tested. CTAHI was never asked to provide any documentation of payroll during the testing portion of the contract.

Response #4:

In regard to the mention of the $34,000 in contractor payment made to Dr. Thomas-Hockaday over a two person, this month was paid to her by a private foundation, for a separate project that she was and is still leading in the area of maternal health. Dr. Thomas- Hockaday was not a part of the regular payroll at the COVID-19 for any extended period of time, and this mention of contractor payments is completely and utterly irrelevant and irresponsible to be included in this investigation. Dr. Thomas-Hockaday earned that money rightfully and honestly through hard work in helping her community by providing expertise to combat the tide of black women dying during childbirth, a cause very dear to her heart as she is a survivor of a complicated child birthing experience. Dr. Thomas-Hockaday takes these mere mentions of this payment that was outside of the scope and purview of the auditors' investigation as an attack on her personally and firmly believes it is being used with the malicious intent to sully her name and reputation as being a fierce healthcare advocate for communities of color in Central Texas.

Additional Observation #2

Response:

CTAHI has no response to this section as we fill it paints an accurate picture of the chaotic nature of how this pandemic was handled. We will only add that we feel this is the exact problem that arises when a department is chronically understaffed and ignored, because public health is not consider a priority over bring in rich investors and put profits before people.

Additional Observation #3

Response:

This observation is a gross mischaracterization of the incident in question. CTAHI submitted a change of address to a state agency in 2020 to begin running courses in a new location in 2021. The application was submitted and CTAHI waited nearly six months for an answer on an approval of the site. During that six-month period numerous emails went unanswered as to the status the approval. The current landlord allowed us to stay in the facility on a month to month basis until the state agency approved the move with the understanding, we would only be there for another 90 days max per the rules of the agency. The new landlord in which CTAHI would be running the space notified us at month six that another tenant was interested in taking our spot. Without anywhere else to go, and the old landlord, on the verge of putting CTAHI out, we made the decision to move forward with moving into the space since the state agency was behind in executing the proper protocol in the required timeframe. Only after Dr. Thomas-Hockaday filed a formal complaint at the highest level of the agency on the timeliness of our request and the situation in which we were in, did the agency impose a fine. They used the fact that Dr. Thomas-Hockaday stated in the complaint that the agency had put CTAHI a position to violate the code with the untimely response, by conducting an ambush surprise visit at the new site and imposing a fine. Leadership from CTAHI and the state agency met on a conference call to discuss the issue and express their displeasure with being retaliated against for filing a complaint and not receiving the services from the agency that they requested. In a compromise, CTAHI agreed to pay the minimum 2000 fine, and in exchange, the agency granted their address change within 14 days of the meeting. To present, the agency and CTAHI have a pleasant and cordial working relationship. CTAHI has recently provided consulting services to the agency, at no cost, to help change statewide processes that will enable other small career colleges such as CTAHI to flourish and be successful. At no point in time did CTAHI ever operate without a license from the agency.

# Appendix B - Office of City Auditor's Response to Subject Response

We have reviewed the subjects' response and believe our findings stand. This investigation was conducted in a fair and objective manner and in compliance with professional standards. Our findings are supported by abundant documentary evidence.

Additionally, the subjects made several false or misleading statements about our investigation. The following is to correct some of the most pertinent:

- We did not inform any private foundations that funded CTAHI about our investigation.

- We did not insist that any witnesses speak to us. All witnesses agreed to meet with us voluntarily. They were free to decline or end interviews whenever they chose.

- No City contract manager attended any meetings between our office and CTAHI.

- The $82,000 figure mentioned in Additional Observation 1 comes directly from a 1099-NEC tax form that CTAHI sent us to document income Hamilton received as a CTAHI contractor in 2021. It is separate and distinct from Hamilton's income as documented on W-2 forms.

Finally, the subjects' response mentions "attached... documentation" and "attached W-2s" in reference to Additional Observation 1. After further consideration, CTAHI elected to not include attachments with its written response.

# Appendix C - Management Response



**MEMORANDUM**

**TO:**       Brian Molloy, Chief of Investigations  Office of the City Auditor, Integrity Unit

**FROM:**   Adrienne Sturrup, Director, Austin Public Health

**DATE**:    March 28, 2023

**SUBJECT**:   Austin Public Health (APH) Management's response to the *Nonprofit Vendor Defrauded Austin Public Health Report*

---

Thank you for the opportunity to respond to the City Auditor's Integrity Unit (CAIU) report, *Nonprofit Vendor Defrauded Austin Public Health.* APH management takes matters of fraud very seriously and agrees with the Findings and Observations stated in the report, as well as the statement that Central Texas Allied Health (CTAHI) management's response contains inaccuracies and misleading statements.

**<u>Additional Observation 2: Oversight Issues at Austin Public Health:</u>**

In April of 2020, APH revised its Social Service Contract Terms and Conditions to update the supporting documentation required for each reimbursement request and ensure specific language was added for potential reimbursements from the federal government related to the pandemic.

*Staff Capacity*

As part of the Covid-19 response, APH received additional local, state, and federal dollars to support the needs of residents dealing with socioeconomic impacts.  The department received over $109M in general funds and grant dollars to administer with no additional staff capacity.  This was almost triple the annual amount normally administered.

To ensure compliance with the supporting documentation required, APH reviewed changes to the Social Service Contract Terms and Conditions in its annual agency training held in December 2020. During the 2021 agency training, staff again reviewed the supporting documentation requirements with the funded agencies with a requirement that all agencies submit the required documentation by January 2022.

*Solicitation Process*

APH's standard practice is to conduct solicitations for funding and competes all social services funding unless there is an emergency declaration or policy directive that dictates direct award. Due to the critical need to provide testing and vaccination services, APH awarded several contracts using emergency authorization.

*Vendor Technical Assistance*

APH contract management staff provided extensive technical assistance to ensure that CTAHI was submitting the appropriate documentation for performance reports and reimbursements since the organization had not previously received funding from the City of Austin.  Staff worked to







balance receiving documentation that could support expenses and ensuring the organization had the funding to continue operations.

**APH Contract Oversight:**

APH has three levels of activities for managing, monitoring, and auditing social services contracts.

o   Contract Management staff are the day-to-day contact for partners, provide technical assistance, approve partners' claims for payment, manage the contract budget and monitor performance levels. Most contract managers have a Social Services program management background and have very limited financial fraud knowledge or training. Contract managers may consult with, or escalate issues to, the Contract Compliance Unit (CCU) or the APH Internal Auditor if fraudulent expenses are suspected.

o   CCU staff do have some financial fraud training and skill in identifying questionable costs submitted in reimbursement requests. In the annual monitoring of every Social Services contract, CCU verifies a sample of financial transactions selected from partners' general ledgers. CCU's monitoring report on CTAHI dated September 2021, did question certain invoices that contained calculation and typographical errors. However, since altered bank statements were provided to CCU by CTAHI, the fraud was not discovered in this review. CCU may consult with, or escalate issues to, the APH Internal Auditor if fraud is suspected.

o   APH's Internal Auditor maintains several audit-related certifications and is trained in identifying fraudulent expenses. When requested, the Internal Auditor provides consulting services to CCU and contract managers regarding unusual issues with reimbursement requests and other contract compliance matters. In August 2021, I assigned the Internal Auditor to audit CTAHI's contracts with APH. The Internal Auditor initially found the fraud in CTAHI's documentation and reported it to CAIU.

APH will continue to provide ongoing training to staff and technical assistance to contracted agencies to ensure compliance with the terms and conditions of the contracts. Additionally, the department will continue to seek and provide training on recognizing financial fraud that is appropriate and relevant to job duties of each of the above functions. New processes for contract managers to verify a sample of expenses at least quarterly will be implemented by August 1, 2023.

Do not hesitate to contact me should you have questions or need further information.

cc:     ████████████████████████████
        City employee
        Corrie Stokes, City Auditor
        ████████████████████████████████
        City employee
        Andrew Williams, Senior Investigator, Office of the City Auditor
        ████████████████████████████████████
        City employees





# Investigation Criteria

**Finding 1**

**City Code § 2-3-5 – Power and Duties (A)(2)**

FRAUD includes, but is not limited to:

(b) the misappropriation of funds, supplies, or other City resources, through methods including, but not limited to theft, embezzlement, or misrepresentation;

(c) the intentional improper handling of or reporting of money or a financial transaction;

**Finding 2**

**City Code § 2-3-5 – Power and Duties (A)(2)**

FRAUD includes, but is not limited to:

(b) the misappropriation of funds, supplies, or other City resources, through methods including, but not limited to theft, embezzlement, or misrepresentation;

## Methodology

We took the following steps to accomplish our investigation objectives:

- Analyzed CTAHI's contract claims against records CTAHI provided to the City, CTAHI's original financial records, and records from other entities
- Compared CTAHI's contract performance reports to CTAHI's original patient records and data from other entities
- Interviewed City staff, the subjects, and other witnesses
- Reviewed applicable City Code and policies

## CAIU Investigative Standards

Investigations by the Office of the City Auditor are considered non-audit projects under Government Auditing Standards and are conducted in accordance with the general and ethics standards, procedures recommended by the Association of Certified Fraud Examiners (ACFE), and the ACFE Fraud Examiner's Manual. Investigations also adhere to quality standards for investigations established by the Council of the Inspectors General on Integrity and Efficiency (CIGIE) and City Code.

The Office of the City Auditor, per City Code, may conduct investigations into fraud, abuse, or illegality that may be occurring. If the City Auditor, through the Integrity Unit, finds that there is sufficient evidence to indicate that a material violation of a matter within the office's jurisdiction may have occurred, the City Auditor will issue an investigative report and provide a copy to the appropriate authority.

In order to ensure our report is fair, complete, and objective, we requested responses from the subjects and the Department Director on the results of this investigation. Please find these responses attached in Appendices A and C.

The Office of the City Auditor was created by the Austin City Charter as an independent office reporting to City Council to help establish accountability and improve city services. We conduct investigations of allegations of fraud, waste, or abuse by City employees or contractors.

**City Auditor**
Corrie Stokes

**Deputy City Auditor**
Jason Hadavi

**Chief of Investigations**
Brian Molloy

**Office of the City Auditor**
**phone:** (512) 974-2805
**email:** AustinAuditor@austintexas.gov
**website:** http://www.austintexas.gov/auditor

 AustinAuditor
@AustinAuditor

Copies of our investigative reports are available at
http://www.austintexas.gov/page/investigative-reports

*Alternate formats available upon request*